*PRELIMINARY PRINT*

VOLUME 604 U. S. PART 1

PAGES 226–304

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

FEBRUARY 25, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published.   Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

## GLOSSIP *v.* OKLAHOMA

### CERTIORARI TO THE COURT OF CRIMINAL APPEALS OF OKLAHOMA

No. 22–7466.   Argued October 9, 2024—Decided February 25, 2025

In 1997, Justin Sneed beat Barry Van Treese to death with a baseball bat
at an Oklahoma hotel owned by Van Treese and managed by petitioner
Richard Glossip.   Glossip initially made inconsistent statements to the
police about Sneed's role in the murder, but he ultimately told police
that Sneed admitted to killing Van Treese.   Sneed later claimed Glossip
had asked him to murder Van Treese because, among other things,
Glossip had wanted to steal Van Treese's money.   Glossip maintained
his innocence and refused a plea deal that would have had him avoid the
death penalty in return for testifying against Sneed.   Sneed then testi-
fied against Glossip at trial in exchange for avoiding the death penalty,
and Sneed's testimony was the only direct evidence connecting Glossip
to the murder.   The jury convicted Glossip and sentenced him to death.
The Oklahoma Court of Criminal Appeals (OCCA) overturned that con-
viction because the defense had been ineffective in challenging Sneed's
testimony and the remainder of the evidence only weakly corroborated
Sneed's account.   At the retrial, Sneed provided inconsistent testimony
on potential motives for Glossip's murder.   Sneed also denied that he
had been prescribed lithium or seen a psychiatrist.   After the defense
established (through the State's medical examiner) that Van Treese had
been attacked with a knife as well as a bat, Sneed testified that he had
repeatedly tried to stab Van Treese in the chest with a pocket knife.
But Sneed had previously denied stabbing Van Treese both when ques-
tioned by the police as well as at Glossip's first trial.   Glossip moved for
a mistrial based on the prosecution's failure to notify the defense about
Sneed's change in testimony, which the trial court denied after the
prosecution disclaimed any knowledge about the change.   Glossip was
again convicted and sentenced to death, and a closely divided OCCA
affirmed, holding that circumstantial evidence suggesting Glossip had
mismanaged the hotel, combined with Glossip's concession that he had
been dishonest in his initial statements after the murder, sufficiently
corroborated Sneed's testimony that he killed Van Treese at Glossip's
direction.

  Glossip subsequently filed several unsuccessful habeas petitions.
Concerns over the integrity of his conviction led a bipartisan group of

Oklahoma legislators to commission an independent investigation by a law firm, Reed Smith. In June 2022, Reed Smith reported "grave doubt" about Glossip's conviction, citing factors such as the prosecution's deliberate destruction of key evidence and the false portrayal of Justin Sneed as a non-violent "puppet." The State then disclosed seven boxes of previously withheld documents, including letters suggesting Sneed had considered recanting and a note from prosecutor Connie Smothermon to Sneed's lawyer noting they should "get to" Sneed to discuss his problematic testimony about a knife found in Van Treese's room. Glossip filed for post-conviction relief based on this evidence and evidence revealed by Reed Smith. Glossip also argued that, during his second trial, Smothermon had interfered with Sneed's testimony about the knife in violation of the rule of sequestration, which prohibits witnesses from hearing each other's testimony. Oklahoma waived any procedural defenses to Glossip's claims, and asked the OCCA to deny the claims on their merits. The OCCA denied Glossip's claims as procedurally barred and meritless.

The State then discovered additional documents revealing that Sneed had been diagnosed with bipolar disorder and prescribed lithium, contradicting his trial testimony. The attorney general determined that Smothermon had knowingly elicited false testimony from Sneed and failed to correct it, violating *Napue* v. *Illinois*, 360 U. S. 264, which held that prosecutors have a constitutional obligation to correct false testimony. Glossip filed a successive petition for post-conviction relief, which the attorney general supported, conceding multiple errors that warranted a new trial. The OCCA denied the unopposed petition without a hearing, holding that Glossip's claims were procedurally barred under Oklahoma's Post-Conviction Procedures Act (PCPA), and further that the State's concession was not "based in law or fact" because it did not create a *Napue* error. This Court stayed Glossip's execution and granted certiorari.

*Held*:

1. This Court has jurisdiction to review the OCCA's judgment. The independent and adequate state ground doctrine precludes the Court from considering a federal question if the state court's decision rests on an independent and adequate state-law ground. The OCCA's application of the PCPA was not such a ground, because the OCCA's decision to apply the PCPA depended on its antecedent rejection of the attorney general's confession of a *Napue* error, which was based solely on federal law. The OCCA held that the confession could not overcome the PCPA's limitations because it lacked a basis in law or fact, specifically finding no *Napue* error.

Oklahoma precedent confirms that the OCCA normally rejects an attorney general's confession of error only after finding it unsupported by law and the record.   By making the application of the PCPA contingent on its determination that the attorney general's confession of federal constitutional error was baseless, the OCCA made the procedural bar dependent on an antecedent ruling on federal law.   To the extent that the OCCA's reasoning on this point is insufficiently "clear from the face of the opinion," the Court presumes reliance on federal law under *Michigan* v. *Long*, 463 U. S. 1032, 1040–1041.   Pp. 242–246.

2. The prosecution violated its constitutional obligation to correct false testimony.   Pp. 246–258.

(a) Under *Napue*, a conviction obtained through the knowing use of false evidence violates the Fourteenth Amendment's Due Process Clause.   To establish a *Napue* violation, a defendant must show that the prosecution knowingly solicited or allowed false testimony to go uncorrected.   If a violation is established, a new trial is warranted if the false testimony could in any reasonable likelihood have affected the jury's judgment; meaning, ordinarily, that the prosecution must establish harmlessness beyond a reasonable doubt.   *United States* v. *Bagley*, 473 U. S. 667, 680, n. 9; *Chapman* v. *California*, 386 U. S. 18, 24.   Here, Oklahoma's attorney general joins Glossip in asserting a *Napue* error, conceding that Sneed's testimony about his lithium prescription was false and that the prosecution knowingly failed to correct it.   The record supports that confession of error.   Evidence showed that Sneed was prescribed lithium to treat bipolar disorder, not after asking for cold medicine as he claimed at trial.   The evidence likewise establishes that the prosecution knew Sneed's testimony was false.   The prosecution almost certainly had access to Sneed's medical file through Sneed's competency evaluation.   And Smothermon's notes show that she had a pretrial conversation with Sneed at which he mentioned "lithium" and "Dr. Trumpet."   The straightforward inference is that Smothermon was aware before trial that Sneed had received his lithium prescription from Dr. Trombka, a psychiatrist and the sole medical professional at the Oklahoma County jail authorized to prescribe lithium.

Because Sneed's testimony was the only direct evidence of Glossip's guilt, the jury's assessment of Sneed's credibility was material and necessarily determinative.   Correcting Sneed's lie would have undermined his credibility and revealed his willingness to lie under oath.   The false testimony also bore on Glossip's guilt because evidence of Sneed's bipolar disorder, which could trigger impulsive violence when combined with his drug use, would have contradicted the prosecution's portrayal of Sneed as harmless without Glossip's influence.   Hence there is a reason-

Syllabus

able likelihood that correcting Sneed's testimony would have affected the judgment of the jury. *Napue*, 360 U. S., at 271. Additional prosecutorial misconduct, such as violating the rule of sequestration, destroying evidence, and withholding witness statements, further undermines confidence in the verdict. Consequently, the prosecution's failure to correct Sneed's false testimony entitles Glossip to a new trial under *Napue*. Pp. 246–252.

(b) The OCCA's contrary holding rests on a mistaken interpretation of *Napue*. The OCCA held that there was no violation because the defense was aware or should have been aware that Sneed was taking lithium. But Sneed's false testimony concerned the reasons for his prescription, not merely the fact that he had taken lithium. Moreover, the Due Process Clause imposes the duty to correct false testimony on the State, not the defense. The OCCA's holding that Sneed was likely in denial of his mental health disorders is beside the point; what matters is that the testimony was false and the prosecutor knowingly allowed it to stand.

Additional arguments in support of the OCCA's position are unpersuasive. *Napue* does not require that the false testimony itself must have directly affected the trial's outcome; *Napue* requires assessing whether the prosecutor's failure to correct the testimony could have contributed to the verdict. Also unpersuasive are arguments based on extra-record materials and insufficient time spent interviewing the prosecutor.

Because the attorney general's confession of error is supported by ample evidence, the Court declines to remand this case for further evidentiary proceedings. When the Court has jurisdiction, a new trial is the appropriate remedy for a violation of *Napue*. Pp. 252–258.

529 P. 3d 218, reversed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KAGAN, KAVANAUGH, and JACKSON, JJ., joined, and in which BARRETT, J., joined as to Part II. BARRETT, J., filed an opinion concurring in part and dissenting in part, *post*, p. 258. THOMAS, J., filed a dissenting opinion, in which ALITO, J., joined, and in which BARRETT, J., joined as to Parts IV–A–1, IV–A–2, and IV–A–3, *post*, p. 262. GORSUCH, J., took no part in the consideration or decision of the case.

*Seth P. Waxman* argued the cause for petitioner. With him on the briefs were *Catherine M. A. Carroll, Zaki Anwar, Donald R. Knight, Amy P. Knight, John R. Mills*, and *Joseph J. Perkovich*.

*Paul D. Clement* argued the cause for respondent under this Court's Rule 12.6. With him on the briefs were *Gentner F. Drummond*, Attorney General of Oklahoma, *Garry M.*

*Gaskins II*, Solicitor General, *Matthew D. Rowen*, and *Joseph J. DeMott*.

  *Christopher G. Michel*, by invitation of the Court, 601 U. S. 1010, argued the cause and filed a brief as *amicus curiae* in support of the judgment below.   With him on the brief were *Rachel G. Frank*, *Alex Van Dyke*, and *Nicholas J. Caluda*.\*

———

\*Briefs of *amici curiae* urging reversal were filed for the District of Columbia et al. by *Brian L. Schwalb*, Attorney General of the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, *Graham E. Phillips*, Deputy Solicitor General, and *Elissa R. Lowenthal*, Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Philip J. Weiser* of Colorado, *Kwame Raoul* of Illinois, *Anthony G. Brown* of Maryland, *Andrea Joy Campbell* of Massachusetts, *Keith Ellison* of Minnesota, *Aaron D. Ford* of Nevada, *Matthew J. Platkin* of New Jersey, *Raúl Torrez* of New Mexico, *Letitia James* of New York, and *Ellen F. Rosenblum* of Oregon; for the American Civil Liberties Union et al. by *William R. Weaver, David D. Cole, Brian W. Stull, Randy Alan Bauman,* and *Megan Lambert*; for Former Members of the Oklahoma Death Penalty Review Commission by *Carter G. Phillips, Virginia A. Seitz,* and *Jacqueline G. Cooper*; for the Innocence Project by *Andrianna D. Kastanek*; for the National Association of Criminal Defense Lawyers by *Barbara E. Bergman* and *Hassan Ahmad*; for R. Michael Cassidy et al. by *Meaghan VerGow, Joshua Revesz,* and *Bruce A. Green*; for Kenneth T. Cuccinelli II, by *Emmet T. Flood*; and for Rep. Kevin McDugle et al. by *Gregory G. Garre*.

  Briefs of *amici curiae* were filed for the State of Texas by *Ken Paxton*, Attorney General, *Brent Webster*, First Assistant Attorney General, *Aaron L. Nielson*, Solicitor General, *Philip A. Lionberger*, Assistant Solicitor General, and *Matthew Ottoway* and *J. Andrew Mackenzie*, Assistant Attorneys General; for the State of Utah et al. by *Sean D. Reyes*, Attorney General of Utah, *Stanford E. Purser*, Solicitor General, *Andrew F. Peterson*, Deputy Solicitor General, and *Ginger Jarvis* and *Mark C. Field*, Assistant Solicitors General, and by the Attorneys General for their respective States as follows: *Treg R. Taylor* of Alaska, *Tim Griffin* of Arkansas, *Liz Murrill* of Louisiana, *Austin Knudsen* of Montana, *Alan Wilson* of South Carolina, and *Jonathan Skrmetti* of Tennessee; for the Criminal Justice Legal Foundation by *Kent S. Scheidegger*; for Current and Former State and Federal Prosecutors by *David A. Senior* and *Ann K. Tria*; for Federal Courts Scholars by *Melanie L. Bostwick, Thomas M.*

Opinion of the Court

JUSTICE SOTOMAYOR delivered the opinion of the Court.

An Oklahoma jury convicted petitioner Richard Glossip of paying Justin Sneed to murder Barry Van Treese and sentenced him to death. At trial, Sneed admitted he beat Van Treese to death, but testified that Glossip had offered him thousands of dollars to do so. Glossip confessed he helped Sneed conceal his crime after the fact, but he denied any involvement in the murder.

Nearly two decades later, the State disclosed eight boxes of previously withheld documents from Glossip's trial. These documents show that Sneed suffered from bipolar disorder, which, combined with his known drug use, could have caused impulsive outbursts of violence. They also established, the State agrees, that a jail psychiatrist prescribed Sneed lithium to treat that condition, and that the prosecution allowed Sneed falsely to testify at trial that he had never seen a psychiatrist. Faced with that evidence, Oklahoma's attorney general confessed error. Before the Oklahoma Court of Criminal Appeals (OCCA), the State conceded that the prosecution's failure to correct Sneed's testimony violated *Napue* v. *Illinois*, 360 U. S. 264 (1959), which held that prosecutors have a constitutional obligation to correct false testimony. The attorney general accordingly asked the court to grant Glossip a new trial. The OCCA declined to grant relief because, it held, the State's concession was not "based in law or fact." 2023 OK CR 5, ¶25, 529 P. 3d 218, 226. Because the prosecution violated its obligations under *Napue*, we reverse the judgment below and remand the case for a new trial.

I

A

Barry Van Treese owned a Best Budget Inn in Tulsa and in Oklahoma City. Richard Glossip managed the Oklahoma

---

*Bondy*, and *Katherine M. Kopp*; and for Derek Van Treese et al. by *Paul G. Cassell*.

City hotel and lived there with his girlfriend. In the summer of 1996, Justin Sneed and his stepbrother approached Glossip and asked him about working for a room. 2 App. 648. Glossip agreed to let them stay in return for help with maintenance and housekeeping. Sneed, however, had a history of violence, angry outbursts, and substance abuse that included marijuana, methamphetamine, cocaine, and acid. *Id.,* at 700–701. When, on January 6, 1997, Van Treese visited the inn to collect cash deposits there, Sneed beat him to death with a baseball bat. See 2007 OK CR 12, ¶¶4–5, 157 P. 3d 143, 147–148 (*Glossip II*).

After killing Van Treese, Sneed evaded law enforcement for several days. Police did promptly interview Glossip, who told them that Sneed had knocked on his door that night with a bump on his head "like somebody punched him." App. to Response to Petitioner's Succ. Application for Post-Conviction Relief in No. PCD–2022–819, Tr. of Glossip Police Interview 15 (Jan. 8, 1997). Glossip added that Sneed had told him he slipped in the shower. *Ibid.* Glossip disclaimed any knowledge of Van Treese's murder, but admitted that he helped Sneed replace (from the outside) the broken window of the room where Van Treese's body was later found. The next day, officers arrested Glossip in front of an attorney's office with approximately $1,700 in cash on him. 1 App. 291–292. Glossip then admitted Sneed had told him "that he killed Barry." Tr. of Glossip Police Interview 10 (Jan. 9, 1997). When confronted with his prior inconsistent statements about the murder and Van Treese's whereabouts, Glossip said that he had been scared to tell the truth because he feared his failure to notify the police immediately meant he was "already involved in it." *Id.,* at 29–30.

The State thereafter charged Sneed with capital murder and Glossip as an accessory after the fact based on his inaccurate statements to the police. Eventually, police located and interviewed Sneed, who had $1,680 in bloody cash on him. See 14 Tr. 18 (May 28, 2004); 15 Tr. 170 (June 1, 2004).

The officers told Sneed that before he "ma[de] up [his] mind on anything" they wanted him "to hear some of the things" they "[had] to say," including that they did not think Sneed had acted alone and that he should not "take the whole thing" himself. 2 App. 645–646. "[E]verybody" was making Sneed "the scapegoat in this," they told him—especially Glossip, who was "putting it on [him] the worst." *Id.*, at 655.

Sneed initially responded to the officers' prompts by attempting to implicate his brother, *ibid.*, but eventually said that Glossip had wanted to steal Van Treese's money and that Van Treese's death had been the result of a robbery gone wrong. *Id.*, at 655–660. Sneed described breaking into Van Treese's room and beating him with a baseball bat until he "figured he was knocked out." *Id.*, at 665. According to Sneed, he then took Van Treese's car keys, stole an envelope with approximately $4,000 in cash from his car, and split the money with Glossip. *Id.*, at 665–669. When officers pressed him on the state of Van Treese's body, Sneed asserted that, "[a]ctually," Glossip had asked him to kill Van Treese so that he "could run the motel without him being the boss." *Id.*, at 675.

Following Sneed's interview, Oklahoma charged Glossip, too, with capital murder. The prosecution offered Glossip a deal: plead guilty and avoid the death sentence in return for testifying against Sneed. See App. to Pet. for Cert. in No. 22–6500, p. 144a. When Glossip refused, maintaining his innocence, the State offered Sneed the same deal, and Sneed accepted. 2001 OK CR 21, ¶5, 29 P. 3d 597, 599 (*Glossip I*). Sneed then testified at Glossip's trial that he beat Van Treese to death "because [Glossip] asked him to do it." *Ibid.* When asked whether there was any "particular reason why [Glossip] wanted to kill [Van Treese]" that night, Sneed replied, "Not that I know of. Every time that Mr. Van Treese showed up, [Glossip] was wanting me to kill him." 6 Tr. 89 (June 8, 1998). In closing, the prosecution argued that Glossip had asked Sneed to kill Van Treese because he be-

lieved Van Treese planned to fire him for embezzling hotel profits. 8 Tr. 14–15 (June 10, 1998). The jury convicted Glossip and sentenced him to death.

The OCCA unanimously reversed. Sneed's testimony was the only direct evidence connecting Glossip to the murder, it held, and "[t]he evidence at trial tending to corroborate Sneed's testimony was extremely weak." *Glossip I*, 29 P. 3d, at 599. Defense counsel's failure to cross-examine Sneed on his many inconsistent statements was therefore "so ineffective" as to undermine any "confidence that a reliable adversarial proceeding took place." *Ibid.*

In 2004, after Glossip rejected another plea offer, 3 App. 720, the State tried him a second time. Several witnesses confirmed what Glossip had told the police in his second interview: In the hours following Van Treese's killing, Glossip feigned ignorance and lied about Van Treese's whereabouts. As in the first trial, however, only one witness, Justin Sneed, testified that Glossip was involved in anything more.[1]

This time, moreover, the defense established (through the State's medical examiner) that Van Treese had been attacked

---

[1] The dissent's narrative, which presents as historical fact the testimony of the prosecution's witnesses at Glossip's second trial, relies heavily on Sneed's testimony to suggest that Glossip directed the crime and an elaborate coverup. See *post*, at 262–267 (opinion of THOMAS, J.). To the extent the dissent relies on witnesses other than Sneed, their testimony confirms no more than what Glossip himself admitted to the police. As for Sneed's testimony, the dissent constructs its favored narrative from among his multiple inconsistent accounts of the murder. See *supra*, at 232–235; compare *post*, at 264 (dissent asserting that "Sneed left [Van Treese's room] when he thought that he had killed Van Treese"), with 2 App. 665 (Sneed telling police he left Van Treese's room when he thought Van Treese was "knocked out"); compare *post*, at 264 (dissent asserting Glossip told Sneed "they would both be evicted if Glossip lost his job"), with 2 App. 655–665 (Sneed telling police that Van Treese's death was the accidental result of a robbery gone wrong), 6 Tr. 89 (June 8, 1998) (Sneed testifying that he did not know why Glossip wanted him to kill Van Treese), and 12 Tr. 75 (May 26, 2004) (Sneed testifying that Glossip had wanted to rob Van Treese).

with a knife as well as with a baseball bat.  1 *id.*, at 239–245.  Although Sneed had denied stabbing Van Treese to the police and at Glossip's first trial, he now said that he had repeatedly tried to stab Van Treese in the chest with a pocket knife.  *Glossip II*, 157 P. 3d, at 148–149.  Because the prosecution had not notified the defense about this change in testimony, Glossip moved for a mistrial.  12 Tr. 105 (May 26, 2004).  The trial court denied that motion after the prosecution attested that the change was news to them, too.  *Id.*, at 107–108 ("The chest thing we're all hearing at the same time").

The prosecution also asked Sneed whether anyone had prescribed him any medication:

"Q. After you were arrested, were you placed on any type of prescription medication?
"A. When I was arrested I asked for some Sudafed because I had a cold, but then shortly after that somehow they ended up giving me Lithium for some reason, I don't know why.  I never seen no psychiatrist or anything.
"Q. So you don't know why they gave you that?
"A. No."  *Id.*, at 64.

Sneed then confirmed that he used illegal drugs including marijuana and "crank" (methamphetamine) "twice a week" prior to his arrest.  *Id.*, at 64–65.  Finally, Sneed testified about Glossip's purported motives for killing Van Treese. He asserted that Glossip had suggested "robbing Barry of his money," *id.*, at 75, that he had "told [Sneed] at one point that with Mr. Van Treese out of the way . . . he would be able not only [to] manage the motel on Council but also another one they had [in Tulsa]," *id.*, at 89, and that he had worried he "was going to get fired" because "a couple of the rooms that were already supposed to be remodeled . . . weren't," *id.*, at 95.

The prosecution weaved these suggestions into its closing argument along with its original theory that Glossip had

wanted Van Treese dead to avoid being fired for embezzlement. See 15 Tr. 65 (June 1, 2004) (arguing Glossip's motive was "a big wad of around 4,000 bucks of American good Yankee dollars to split with the kid"); *id.*, at 153, 163 (arguing Glossip was going to be fired because of "missing money"); *id.*, at 164–165 (arguing Glossip was going to be fired because of the condition of the rooms). It then argued that Sneed, "satisfied and contented with [his] humble life," *id.*, at 68, had no propensity to violence except at Glossip's direction:

> "[I]t's as if Justin Sneed was a Rottweiler puppy, let's say 11 months old, and Richard Glossip was the dog trainer. You can sure sick a dog on somebody, but if you're going to do that and you send a dog that's not trained or is a little bit too young, he might trip and fall, he might get scared and run away, he might do something stupid, he might not do a good job. But no matter how you slice it, no matter how you parse it, the person that says 'sick 'em' is the person that makes the decision." *Id.*, at 73.

The jury again convicted Glossip of capital murder and again sentenced him to death.

A closely divided OCCA affirmed, holding that circumstantial evidence suggesting Glossip had mismanaged the hotel, combined with the concession that Glossip had been dishonest in his initial statements after the murder, sufficiently corroborated Sneed's testimony that he killed Van Treese at Glossip's direction. *Glossip II*, 157 P. 3d, at 151–153. In dissent, Judge Chapel and Judge A. Johnson argued that the majority "overstate[d] the strength of the accomplice corroboration evidence." *Id.*, at 164–165, 175.

B

Glossip continued to maintain his innocence in the years after his conviction, filing several habeas petitions in state and federal court. Although that litigation did not result in relief, mounting concerns over the integrity of Glossip's

conviction drew the attention of the Oklahoma Legislature. A bipartisan group of 62 Oklahoma legislators retained a law firm, Reed Smith, to conduct an independent investigation into the case. Pet. for Cert. 12; App. to Pet. for Cert. 390a–391a. In June 2022, Reed Smith reported its "grave doubt as to the integrity of Glossip's murder conviction and death sentence." Independent Investigation of *State* v. *Richard E. Glossip* 6 (June 7, 2022). Among other things, Reed Smith concluded the prosecution had deliberately destroyed "key physical evidence" before Glossip's retrial, including several items from the crime scene and the inn's receipts and deposit books, which could have helped Glossip address the accusations of embezzlement. *Id.*, at 7, 9, n. 25, 34, 48. Reed Smith further concluded that the State had "falsely portrayed Sneed at trial as a meek and non-violent 'puppet,'" *id.*, at 10, and that key testimony about Glossip's motive and actions on the morning after the murder had been provided by a former police officer of "*'very limited honesty and integrity'*" who was jailed for making false statements shortly after Glossip's second trial, *id.*, at 6–12.

Two months after Reed Smith's report, the State disclosed seven boxes of previously withheld documents from Glossip's trials. Those boxes contained a note the head prosecutor, Connie Smothermon, sent to Sneed's lawyer before Sneed testified at the second trial. Smothermon's note concerned "a few items that have been testified to that I needed to discuss with Justin," including the "biggest problem," which (the note said) was "still the knife." 3 App. 953. The examiners' testimony about the knife was problematic, Smothermon's note explained, because "Justin [told] the police that the knife fell out of his pocket and that he didn't stab the victim with it," yet the victim had "'lacerations'" consistent with the "knife blade." *Ibid.* It did not "make much sense" to Smothermon, moreover, "that Justin could have control of the bat and a knife" on his own. *Ibid.* "[W]e should get to him this afternoon," the note concluded. *Ibid.*

The boxes further contained letters from Sneed to his attorney suggesting he had expressed a desire to recant his testimony prior to Glossip's second trial. See *id.*, at 811–816. For example, in a letter dated May 15, 2003, Sneed wrote to his attorney asking " 'do I have the choice of recanting my testimony at any time during my life,' " and is " 'there . . . anything you know, on [Glossip's] court date and about re-canting.' " *Id.*, at 815 (emphasis deleted); App. to Pet. for Cert. in *Glossip* v. *Oklahoma*, No. 22–6500, at 192a.[2]

Based on this new evidence and the evidence revealed by Reed Smith, Glossip filed another motion for post-conviction relief with the OCCA. Among other things, Glossip argued that, during his second trial, Smothermon had interfered with Sneed's testimony about the knife in violation of the rule of sequestration, which prohibits witnesses from hearing each other's testimony. 3 App. 785–882. Oklahoma responded that Glossip's claims were meritless, but that it would nonetheless waive any procedural defenses in order to mitigate the damage from a "media campaign" on Glossip's behalf. *Id.*, at 717–718. Oklahoma further asked the OCCA to deny Glossip's claims on their merits so as "to trigger the state court deference anticipated in [the Antiterrorism and Effective Death Penalty Act]" in any future federal review. *Id.*, at 718, n. 7. Noting that it alone would "determine whether the rules of this Court should be abandoned," the OCCA held that Glossip's claims were procedurally barred as well as meritless. *Id.*, at 775–783.

---

[2] The dissent claims Sneed thought the phrase " 'recan[t] my testimony' " meant " 'refuse to testify,' " *post*, at 272, n. 2, meaning (on the dissent's view) Sneed asked his lawyer: "If I [testify] again, do I have the choice of [refusing to testify] at any time during my life?" The dissent further points to an interview Sneed gave decades later, where (with Glossip's execution imminent) he denied ever " 'want[ing] to change the truth.' " *Post*, at 271, n. 2. Of course, Sneed's much later denials do not erase his prior statements about recanting.

Opinion of the Court

Shortly thereafter, the State "unearthed disturbing revelations about the contents of" an eighth box of trial documents "consisting of material it previously prevented the defense from obtaining." Brief for Respondent 10. "Buried inside Box 8," the State says, "was a page of notes handwritten by Smothermon during a pretrial interview with Sneed," indicating "that Sneed had told Smothermon that he was 'on lithium' not by mistake, but in connection with a 'Dr. Trumpet.'" *Ibid.* Oklahoma's attorney general "deduced the import of these notes in short order": Only a single psychiatrist worked in the Oklahoma County jail when Sneed was held there, and his name was Dr. Larry Trombka. *Ibid.*; see also 3 App. 930. A summary of Sneed's medical records (previously withheld from Glossip's counsel after motion practice seeking their discovery) showed that Sneed had received lithium to treat his undisclosed bipolar disorder. Brief for Respondent 10; 3 App. 1005. After this discovery, Dr. Trombka signed an affidavit attesting that he was the only medical professional at the jail who would have prescribed Sneed lithium. *Id.*, at 1003.

The attorney general accordingly determined that Sneed "was not in fact mis-prescribed lithium, but rather diagnosed with bipolar disorder and treated with lithium under the care of a psychiatrist"—and "despite her knowledge of these facts," Smothermon "elicited false testimony from Sneed" on that subject. Brief for Respondent 11.[3]

_____

[3] Also included in Box 8 were prosecutors' witness interview notes suggesting the State may have omitted certain details from the summaries it turned over to the defense. For example, one witness apparently told the prosecution that Glossip had sold him a big screen TV and a couch for $900, 3 App. 952—a sum that would account for much of the cash Glossip had on his person at his arrest. That same witness testified at trial that he did not know how much money Glossip had received for those sales. 1 *id.*, at 286. Glossip's girlfriend later explained in a post-trial affidavit that Glossip had been selling their possessions to pay for an attorney. 2 *id.*, at 706.

The attorney general thereafter disclosed Box 8 to Glossip and retained an independent counsel to conduct another review of Glossip's conviction. As relevant here, the independent counsel concluded that Smothermon's attempt to interfere with Sneed's testimony about the knife violated the rule of sequestration, that her failure to turn over Sneed's statements about his mental health treatment violated *Brady* v. *Maryland*, 373 U. S. 83 (1963), and that her failure to correct Sneed's false trial testimony that he had been given lithium after asking for cold medicine violated *Napue*, 360 U. S. 264. App. to Pet. for Cert. 50a, 58a. His report concluded:

> "[T]he State must vacate Glossip's conviction due to its decades-long failure to disclose what I believe is *Brady* material, correct what I believe was false trial testimony of its star witness, and what I believe was a violation of the Court ordered Rule of Sequestration of witnesses. . . . In my view, this case is also permeated by failures to secure, safeguard and maintain evidence in a capital murder case." *Id.*, at 62a.

Following the Box 8 disclosure and the independent counsel's recommendation, Glossip filed a successive petition for post-conviction relief with the OCCA asserting *Brady*, *Napue*, cumulative error, and actual innocence claims.[4] The attorney general filed a "Response in Support of Petitioner's Successive Application for Post-Conviction Relief." 3 App. 973. Although the attorney general did not endorse Glossip's actual innocence claim, he represented that his office had "concluded that Justin Sneed . . . made material misstatements to the jury regarding his psychiatric treatment and

---

[4] The dissent faults Glossip for "ignor[ing] the lithium issue on direct appeal" years earlier. *Post*, at 269. Glossip had no reason to know at the time of his direct appeal that Smothermon knowingly failed to correct Sneed's false testimony about why he had been given lithium, however, so he would have had no occasion to raise his *Napue* or *Brady* claims then.

the reasons for his lithium prescription," which the State
had failed to correct in violation of *Napue*.  3 App. 974.   In
addition, the State indicated it was "concerned that there
were multiple and cumulative errors, such as violation of the
rule of sequestration and destruction of evidence, that when
taken together with Sneed's misstatements warrant" a new
trial.  *Ibid.*; see also *id.*, at 977 ("[T]he State believes
Glossip is entitled to post-conviction relief"); *id.*, at 978
(State is "compelled, consistent with *Napue*," to correct mis-
statements); *id.*, at 979 ("[T]he State requests that the Court
vacate Glossip's conviction and that the case be remanded to
the district court").   Because Oklahoma agreed with Glossip
on the pertinent facts, it did not request an evidentiary
hearing.

   The OCCA denied Glossip's unopposed petition without a
hearing.  It acknowledged the attorney general's request
that Glossip's conviction be vacated, noting that this conces-
sion alone could not "directly" provide a ground for relief.
529 P. 3d, at 223.   The court said the following about the
State's confession of *Napue* error:

> "Glossip claims that the State failed to disclose evidence
> of Justin Sneed's mental health treatment and that
> Sneed lied about his mental health treatment to the jury.
> Though the State in its response now concedes that this
> alleged false testimony combined with other unspecified
> cumulative errors warrant postconviction relief, the con-
> cession alone cannot overcome the limitations on succes-
> sive post-conviction review.  *See* 22 O.S. Supp. 2022,
> § 1089(D)(8).   The State's concession is not based in law
> or fact."   529 P. 3d, at 226 (footnote omitted).

The OCCA then applied Oklahoma's Post-Conviction Proce-
dures Act (PCPA) to hold that Glossip's claims were proce-
durally barred.  It concluded separately that the evidence
presented by the parties did not "create a *Napue* error."
*Ibid.* (footnote omitted).

Opinion of the Court

This Court thereafter stayed Glossip's execution at the joint request of the parties and granted certiorari to consider Glossip's *Brady* and *Napue* claims and the effect of the attorney general's confession of error.[5] 601 U. S. 999 (2024). The Court also requested argument on an additional question: whether the OCCA's holding that the PCPA precluded post-conviction relief is an adequate and independent state-law ground for the judgment.

Because Oklahoma agrees with Glossip on the merits of his appeal, the Court appointed Christopher Michel as *amicus curiae* to defend the judgment below. 601 U. S. 1010 (2024). He has ably discharged his responsibilities.

## II

### A

We begin with this Court's jurisdiction to review the OCCA's judgment. " 'This Court will not take up a question of federal law presented in a case "if the decision of [the state] court rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment." ' " *Cruz* v. *Arizona*, 598 U. S. 17, 25 (2023) (quoting *Lee* v. *Kemna*, 534 U. S. 362, 375 (2002)). "In the context of direct review of a state court judgment, the independent and adequate state ground doctrine is jurisdictional." *Coleman* v. *Thompson*, 501 U. S. 722, 729 (1991). A state ground of decision is independent only when it does not depend on a federal holding, *Foster* v. *Chatman*, 578 U. S. 488, 498 (2016), and also is not intertwined with questions of federal law, *Michigan* v. *Long*, 463 U. S. 1032, 1040–1041 (1983). "[W]hen the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state

---

[5] Because the Court grants relief under *Napue*, the Court need not reach the merits of Glossip's *Brady* claim.

court decided the case the way it did because it believed that federal law required it to do so." *Ibid.*

*Amicus* argues this Court lacks jurisdiction because the OCCA held that Glossip's claims were barred under the PCPA, and the PCPA is "a paradigmatic independent and adequate state-law ground." Brief for Court-Appointed *Amicus Curiae* 13. That argument fails because it overlooks an antecedent holding that turned on federal law. The OCCA first rejected the attorney general's confession of *Napue* error, deeming it meritless and therefore incapable of "overcom[ing]" application of the PCPA. 529 P. 3d, at 226. Only then did it apply the PCPA to Glossip. Because the OCCA's decision to reject the attorney general's confession of error rested exclusively on federal law, so too did its subsequent decision to apply the PCPA.

In his brief to the OCCA, the attorney general disclaimed reliance on any procedural defenses, including the PCPA. Instead, the attorney general "concede[d] error under *Napue*," 3 App. 978, acknowledging that, as a matter of federal law, the prosecution's knowing failure to correct Sneed's "material misstatements" entitled Glossip to a new trial. *Id.*, at 977, 978, 979. The OCCA held that this confession of *Napue* error could not "overcome the [PCPA's] limitations on successive post-conviction review" because it was "not based in law or fact." 529 P. 3d, at 226. Specifically, the OCCA concluded that the underlying evidence "d[id] not create a *Napue* error." *Ibid.* (footnote omitted). Thus, the OCCA's application of the PCPA over the attorney general's confession of error depended on its determination that no *Napue* violation had occurred. That was a federal holding, and it was the only reason the OCCA provided for its conclusion that the attorney general's confession could not "overcome" the PCPA. 529 P. 3d, at 226. The PCPA therefore poses no impediment to our review in this case.

Oklahoma precedent involving confessions of error by an attorney general confirms this reading. As the OCCA has

repeatedly explained, it will normally reject an attorney general's confession of error only after finding that it lacks a basis in the law and in the record. See, *e. g.*, *Bindrum* v. *State*, 27 Okla. Crim. 372, 228 P. 168 (1924) ("Where the Attorney General confesses error, th[e] court will examine the record, and, if the confession is sustained thereby, and is well founded in law, the conviction will be reversed" (syllabus by the court)).[6]  Otherwise, if the confession of error is supported by the law and the record, the OCCA will reverse the underlying conviction and remand for a new trial.[7]  *Ibid.* The OCCA applied that same rule here: It rejected the attorney general's confession of error as having no basis "in law or fact," and explained that it would therefore apply the PCPA.  529 P. 3d, at 226.

In doing so, the OCCA "made application of the procedural bar depend on an antecedent ruling on federal law, that is, on the determination of whether federal constitutional error ha[d] been committed." *Ake* v. *Oklahoma*, 470 U. S. 68, 75 (1985).  After all, it made application of the PCPA contin-

---

[6] See also *Raymer* v. *State*, 27 Okla. Crim. 398, 228 P. 500 (1924) ("Where the Attorney General confesses error, th[e] court will examine the record, and, if the confession is sustained thereby and is well founded in law, the conviction will be reversed" (syllabus by the court)); *Dorsett* v. *State*, 16 Okla. Crim. 65, 69, 180 P. 557, 558 (1919) (reversing conviction because "the confession of error [of the attorney general] is well founded" in law); *Whittemore* v. *State*, 26 Okla. Crim. 338, 223 P. 890 (1924) (*per curiam*) (same); *Day* v. *State*, 352 P. 2d 935 (OCCA 1960) ("Where the Attorney General confesses error, Court of Criminal Appeals will examine the record, and, if confession is sustained thereby, and is well founded in law, conviction will be reversed" (syllabus by the court)); *Casey* v. *State*, 440 P. 2d 208, 209 (OCCA 1968) ("When the Attorney General confesses error, this Court will carefully examine the record for fundamental error"); *McConnell* v. *State*, 485 P. 2d 764, 765 (OCCA 1971) (similar); *One Ford Touring Car* v. *State*, 100 Okla. 267, 268, 229 P. 231, 232 (1924) (establishing identical rule in civil forfeiture context).

[7] The PCPA would not stand in the way of a reversal under this rule because it is not a jurisdictional bar.  See *Valdez* v. *State*, 2002 OK CR 20, ¶¶24–28, 46 P. 3d 703, 710.

gent on its determination that the attorney general's confession of federal constitutional error had no basis in law or fact. To the extent that the OCCA's reasoning on this point is insufficiently "clear from the face of the opinion," we nonetheless presume reliance on federal law under *Michigan* v. *Long*, 463 U. S., at 1040–1041. This Court therefore has jurisdiction to review the judgment below.

B

The dissent dismisses all this as an "invent[ed] . . . federal holding that the OCCA never made." *Post*, at 279. As the dissent sees it, the OCCA rejected the attorney general's confession of error because (the dissent says) the State failed adequately to address all of the PCPA's procedural requirements. See *post*, at 280. The OCCA plainly held that the attorney general's confession was "not based in law or fact," 529 P. 3d, at 226, however, forcing the dissent to provide an awkward explanation that this holding about a federal confession of error on the merits was only about the PCPA's state-law, procedural requirements. *Post*, at 280. Yet the State expressly attempted to waive those procedural requirements by arguing that Glossip was entitled to a new trial. 3 App. 979 ("[T]he State requests that the Court vacate Glossip's conviction and that the case be remanded to the district court"). So to explain away the "based in law or fact" language, the dissent must proceed on the assumption that Oklahoma law requires applicants to satisfy the PCPA's nonjurisdictional provisions even when the State waives them and even if the State's confession of constitutional error is otherwise meritorious—notwithstanding the many other contexts where the OCCA privileges meritorious confessions of error. See n. 6, *supra* (collecting cases); App. to Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 1a–21a (cataloging the OCCA's decisions in the 298 confession-of-error cases predating Glossip's, all of which resulted in relief).

That assumption is hardly "clear from the face of the opinion" below. *Long*, 463 U. S., at 1041. Thus, we must "accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so." *Ibid.*

## III

### A

Turning to the merits, we conclude that the prosecution violated its constitutional obligation to correct false testimony.

In *Napue* v. *Illinois*, this Court held that a conviction knowingly "obtained through use of false evidence" violates the Fourteenth Amendment's Due Process Clause. 360 U. S., at 269. To establish a *Napue* violation, a defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it "to go uncorrected when it appear[ed]." *Ibid.* If the defendant makes that showing, a new trial is warranted so long as the false testimony "may have had an effect on the outcome of the trial," *id.*, at 272— that is, if it "'in any reasonable likelihood [could] have affected the judgment of the jury,'" *Giglio* v. *United States*, 405 U. S. 150, 154 (1972) (quoting *Napue*, 360 U. S., at 271). In effect, this materiality standard requires "'"the beneficiary of [the] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."'" *United States* v. *Bagley*, 473 U. S. 667, 680, n. 9 (1985) (quoting *Chapman* v. *California*, 386 U. S. 18, 24 (1967)).

Here, Oklahoma's attorney general joins Glossip in asserting a *Napue* error, conceding both that Sneed's testimony was false and that the prosecution knowingly failed to correct it. The record supports that confession of error. A summary of Sneed's medical records created by the local sheriff's department establishes that someone diagnosed Sneed with bipolar disorder and prescribed him lithium.  3

App. 1005. Dr. Trombka, a psychiatrist, attested in a sworn affidavit that he was the only medical professional at the Oklahoma County jail who would have issued Sneed that prescription. *Id.*, at 930–931. Dr. Trombka also confirmed, and nobody contests, that lithium is used only in psychiatric treatments and not for dental pain (as Sneed said at a pretrial hearing) or a cold (as Sneed testified at Glossip's trial). *Ibid.* Nor would anyone confuse lithium with Sudafed, which is a cold medication. *Ibid.* Sneed's trial testimony that he had been given lithium after asking for Sudafed and had "never seen no psychiatrist or anything" was therefore false.

The evidence likewise establishes that the prosecution knew Sneed's statements were false as he testified to them. The prosecution almost certainly had access to Sneed's medical file, which would have listed both the lithium prescription and the bipolar diagnosis. Among other things, those records would have been provided to the State as part of Sneed's competency evaluation, *id.*, at 931, and the State opposed Glossip's discovery request of Sneed's medical files on its merits, 2 *id.*, at 622–623; 3 *id.*, at 933. As *amicus* and the dissent emphasize, moreover, "[l]ithium is prescribed only for mood disorders." Brief for Court-Appointed *Amicus Curiae* 14; *post*, at 268 ("It is undisputed that lithium's sole medical purpose, both in 1997 and today, is to treat bipolar disorder and other mental health disorders"). Yet the prosecution knew that Sneed had previously told a competency evaluator that he had been prescribed lithium "after his tooth was pulled," 2 App. 700; that statement was part of a competency record to which both the State and Glossip had access, *id.*, at 698–703. Prosecutors then heard Sneed testify to a different version of events at trial: that the lithium had been given to him after he asked for Sudafed because he had a cold. 1 *id.*, at 312.

In addition, Smothermon's notes show that she had a pretrial conversation with Sneed at which he mentioned "lith-

ium" and "Dr. Trumpet." 3 *id.*, at 927. Glossip argues, and
the attorney general admits, that this shows Sneed told
Smothermon that Dr. Trumpet (meaning Dr. Trombka) had
prescribed him lithium. As just discussed, the record shows
that, in fact, Dr. Trombka did diagnose Sneed with bipolar
disorder and prescribe him lithium. Sneed plainly discussed
these matters with the prosecution. In that private conver-
sation, he would have had little to gain from prevaricating
about his prescriptions, nor do the notes suggest he did any-
thing of the kind. The straightforward inference is that
Sneed told Smothermon that Dr. Trombka had prescribed
him the lithium.[8]

That leaves materiality. Evidence can be material even if
it "goes only to the credibility of the witness," *Napue*, 360
U. S., at 269; indeed, "[t]he jury's estimate of the truthfulness
and reliability of a given witness may well be determinative
of guilt or innocence," *ibid*. Because Sneed's testimony was
the only direct evidence of Glossip's guilt of capital murder,
the jury's assessment of Sneed's credibility was necessarily
determinative here. Besides Sneed, no other witness and
no physical evidence established that Glossip orchestrated
Van Treese's murder. Thus, the jury could convict Glossip
only if it believed Sneed.

Had the prosecution corrected Sneed on the stand, his
credibility plainly would have suffered. That correction
would have revealed to the jury not just that Sneed was
untrustworthy (as *amicus* points out, the jury already knew
he repeatedly lied to the police), but also that Sneed was

---

[8] The dissent claims Sneed instead repeated his prior false statement
that he had been given the lithium after having his tooth pulled. See
*post*, at 273, 274, n. 3, 286, n. 6, 302–303. Yet the dissent's only source for
this theory, Smothermon's co-counsel Gary Ackley, acknowledged under
oath that he knew lithium was not a pain medication, 3 App. 940, meaning
he would have known this story, too, to be wrong. In any event, even if
the prosecution did believe Sneed had been given lithium for a toothache,
that still would have put them on notice that Sneed's testimony at trial
(about receiving lithium after asking for cold medication) was false.

willing to lie to them under oath. Such a revelation would be significant in any case, and was especially so here where Sneed was already "nobody's idea of a strong witness." Brief for Court-Appointed *Amicus Curiae* 37. Even if Sneed's bipolar disorder were wholly irrelevant, as *amicus* argues, his willingness to lie about it to the jury was not. "'A lie is a lie, no matter what its subject.'" *Napue*, 360 U. S., at 269–270 (quoting *People* v. *Savvides*, 1 N. Y. 2d 554, 557, 136 N. E. 2d 853, 854–855 (1956)).

Sneed's false testimony also bore on Glossip's guilt in a more direct way. As Smothermon's co-counsel Gary Ackley has conceded, it "would have been an important fact for the defense to know" that Sneed had been prescribed lithium to treat bipolar disorder. 3 App. 940. After the Box 8 disclosures, Dr. Trombka explained to Glossip's counsel that bipolar disorder symptoms "can be exacerbated by illicit drug use, such as methamphetamine," to "cause an individual to be more paranoid or potentially violent." *Id.*, at 932. Sneed admitted at trial that he regularly used drugs, including methamphetamine. His diagnosis with a disorder that could trigger impulsive violence when combined with drug use thus would have undermined the prosecution's theory that Sneed was harmless on his own—a Rottweiler puppy beholden to his trainer. 15 Tr. 73 (June 1, 2004). That theory was an important part of the prosecution's case and featured prominently in its opening and closing statements. See, *e.g.*, 3 Tr. 209 (May 13, 2004) (arguing in opening that Sneed was "pretty content . . . to do whatever it is that Richard Glossip wanted him to do"); 15 Tr. 69–74 (June 1, 2004) (emphasizing in closing that Sneed would have never committed murder without Glossip). Hence there is a reasonable likelihood that correcting Sneed's testimony would have affected the judgment of the jury. *Napue*, 360 U. S., at 271.

*Amicus* objects that "the jury already knew that Sneed had been prescribed lithium, used illegal drugs, and behaved impulsively; he admitted that he beat a man to death with a

Page Proof Pending Publication

baseball bat in the middle of the night with no advanced planning." Brief for Court-Appointed *Amicus Curiae* 36. As *amicus* sees it, the additional evidence provided by Sneed's lie and his treatment for bipolar disorder could hardly have made a difference in light of so much other impeaching evidence. *Id.*, at 36–37. Of course, at trial, the prosecution urged the jury to believe just the opposite: that despite his prior dishonesty and violence, Sneed was now telling the truth. See, *e. g.*, 15 Tr. 153–155 (June 1, 2004). A prosecutor's midtrial revelation that Sneed lied on the stand would have significantly undercut that argument.

In any event, *amicus*'s position is self-defeating. If the evidence impeaching Sneed's credibility was already overwhelming, then no reasonable jury could have convicted Glossip in the first place, given that the prosecution's case rested centrally on Sneed's credibility. *Amicus* appears to assume the jury would have believed Sneed no matter what. Such an assumption has no place in a materiality analysis, which asks what a reasonable decisionmaker would have done with the new evidence. See *Wearry* v. *Cain*, 577 U. S. 385, 393–394 (2016) (*per curiam*) (rejecting argument that evidence was immaterial because witness's credibility was "already impugned"); cf. *Strickland* v. *Washington*, 466 U. S. 668, 695 (1984).

Although the prosecution's failure to correct Sneed's false testimony was a material *Napue* violation on its own, additional conduct by the prosecution further undermines confidence in the verdict. The attorney general has confessed to "'violation of the rule of sequestration'" with respect to Smothermon's apparent midtrial attempt to speak with Sneed about the knife, as well as to "'destruction of evidence,'" including the hotel's financial records and items Glossip and Sneed allegedly handled in Van Treese's room. See Brief for Respondent 13; 3 App. 935 (prosecutor Ackley attesting under oath that "I was informed that a box of evidence containing 10 items was destroyed by the Oklahoma

Opinion of the Court

City Police Department. . . . It is likely that I was aware of that fact during the 2004 retrial . . . . That this happened horrifies me"); Independent Investigation of *State* v. *Richard E. Glossip*, at 7, 12–13, 41–43 (cataloging destroyed items). In addition, the eight boxes of documents released to Glossip included statements from Sneed evincing a desire to recant his testimony and witness notes with details not previously turned over to the defense. For example, the files suggest one witness told the prosecution (contrary to his trial testimony) that Glossip sold him a couch and a TV for $900. 3 App. 952. That evidence would have supported Glossip's account of the cash he carried at his arrest outside an attorney's office: that he had sold his possessions to pay for an attorney. See 2 *id.*, at 706. Because prejudice analysis requires a "cumulative evaluation" of all the evidence, whether or not that evidence is before the Court in the form of an independent claim for relief, these documents reinforce our conclusion that the *Napue* error here prejudiced the defense. *Kyles* v. *Whitley*, 514 U. S. 419, 441 (1995).[9]

---

[9] The dissent's attempts to minimize these issues are unpersuasive. Sneed's letter inquiring about "'the choice of recanting my testimony,'" 3 App. 815, disproves the dissent's assertion that "there is no evidence that Sneed wished to 'recant' his testimony." *Post*, at 293. That Glossip recalled receiving only $490 for his possessions during his first trial does not absolve the prosecution from its ordinary duty to disclose inconsistent statements by its witnesses. Contra, *ibid.* The State's conceded sequestration violation also is not merely an insignificant state-law issue, *post*, at 292; like any other attorney, a prosecutor may not seek to influence the content of a witness's testimony. See, *e. g.*, *Geders* v. *United States*, 425 U. S. 80, 90, n. 3 (1976) ("An attorney must respect the important ethical distinction between discussing testimony and seeking improperly to influence it"). The dissent labors to discredit certain "handwritten notes" on which neither Glossip nor this Court relies, see *post*, at 293, n. 8, but Smotherson undisputedly wrote to Sneed's counsel that she needed to "get to" him "to discuss" his problematic testimony about the knife. 3 App. 953. The next day, Sneed's testimony corrected the very problem raised by Smotherson's letter. Smotherson nonetheless disclaimed any knowledge of Sneed's change in testimony when Glossip objected. 12 Tr.

For these reasons, we conclude that the prosecution's failure to correct Sneed's trial testimony violated the Due Process Clause.   Glossip is entitled to a new trial.

B

The OCCA's contrary holding rested on a mistaken interpretation of *Napue.*   According to the OCCA, there was no violation because the defense "was aware or should have been aware that Sneed was taking lithium at the time of trial," and the prosecution could not have "knowingly concealed" something the defense already knew.   529 P. 3d, at 226.   As an initial matter, Sneed's false testimony concerned the reasons for his lithium prescription, not the mere fact that he had taken it.   Glossip's counsel was aware of the latter, not of the former.   In any event, the Due Process Clause imposes "'the responsibility and duty to correct'" false testimony on "representatives of the State," not on defense counsel.   *Napue*, 360 U. S., at 269–270 (quoting *Savvides*, 1 N. Y. 2d, at 557, 136 N. E., at 854).

The OCCA also held that Sneed's testimony was not "clearly false" because Sneed was "more than likely in denial of his mental health disorders."   529 P. 3d, at 226, 227.   It is not apparent why the OCCA thought Sneed was in denial, nor why such denial should have caused Sneed to believe that he had never seen a psychiatrist, when in fact he had. Even supposing it did, however, Sneed's beliefs are beside the point.   What matters is that his testimony was false and a prosecutor knowingly let it stand nonetheless.   *Napue*, 360 U. S., at 269 ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment").

107–108 (May 26, 2004).   Finally, not even the original prosecutors dispute that the police destroyed key evidence before Glossip's retrial; the dissent nonetheless dismisses that claim, undisputed for over two decades, as this Court's "own creation."   *Post*, at 292–293.

Opinion of the Court

The dissent's arguments in support of the OCCA's conclusions fare no better. As an initial matter, even the dissent does not dispute that Sneed falsely testified he had never seen a psychiatrist. See *post*, at 290 (suggesting Sneed "misremembered" that a psychiatrist prescribed him lithium to treat bipolar disorder). The dissent does maintain that other aspects of Sneed's statement were true, noting that because Sneed was in denial about his diagnosis, his "statement about his own knowledge was not false." *Post*, at 291. Sneed's statement that he asked for "Sudafed" to treat "a cold" and was given lithium instead, 12 Tr. 64 (May 26, 2004), was not, however, a statement "about his own knowledge." Even if Sneed himself did not believe that he suffered from bipolar disorder, moreover, that would not render true his assertion that he had no idea why his doctor thought he needed lithium.

The dissent next claims that the false testimony must itself have directly affected the trial's outcome to be material under *Napue*. *Post*, at 288 ("[T]he relevant inquiry under *Napue* is whether the *content* of the false testimony at issue is material"). As *Napue* made clear, however, " '[a] lie is a lie, no matter what its subject.' " 360 U. S., at 269–270 (quoting *Savvides*, 1 N. Y. 2d, at 557, 136 N. E. 2d, at 854–855). Nothing in *Napue* requires ignoring the fact of Sneed's perjury in the prejudice analysis. To the contrary, materiality instead always requires courts to assess whether "the error complained of" could have contributed to the verdict. *Chapman*, 386 U. S., at 24; *Bagley*, 473 U. S., at 680, n. 9. Here, the prosecutor's failure to correct Sneed's false testimony is the relevant error, so the Court asks whether a correction could have made a material difference. The answer is clearly yes. See *supra*, at 247–252.[10]

---

[10] The dissent also argues Sneed's lithium use was immaterial because "the defense chose not to turn" it "into an impeachment issue," *post*, at 288, but each premise in that argument is mistaken. First, the defense did not choose "not to raise Sneed's mental condition," *post*, at 287; they asked him

The remaining arguments offered in defense of the OCCA's position are likewise unpersuasive.   In an *amicus* brief, the Van Treese family argues that it was Glossip's counsel who asked Sneed about his lithium prescription, and that Smothermon's notes reveal only that Sneed relayed those questions to Smothermon.   See Brief for Victim Family Members as *Amici Curiae* 7–22.   That argument relies heavily on extra-record materials not properly before the Court, including a recent unsworn statement from Smothermon adopting the family's interpretation of the notes.   (The dissent, which criticizes the independent counsel for "impugning" the trial prosecutors' reputation, *post*, at 276, justifies its reliance on these materials by accusing the Oklahoma attorney general of "collusively exclud[ing]" them from the record, see *post*, at 303.)   Nor would accepting the family's account change the *Napue* analysis.   Whatever the impetus for the conversation, the family agrees that Sneed and Smothermon discussed Dr. Trombka and lithium.   The natural inference is that Sneed explained to Smothermon the circumstances that led to his lithium use.   To avoid that inference, the family in turn suggests both that Sneed was never diagnosed with bipolar disorder in the first place, Brief for Victim Family Members as *Amici Curiae* 17, and that Glossip's counsel "knew about [Dr. Trombka] more than two decades ago," *id.*, at 21.   Yet for the reasons previously explained, defense counsel's purported knowledge of Dr. Trombka's existence is irrelevant, and the prison medical record supports the attor-

_____

about it in cross-examination and Sneed repeated his false testimony.   See 13 Tr. 15 (May 27, 2004).   Second, the defense did not know during trial that Sneed had been diagnosed with bipolar disorder; to the contrary, Glossip later sought (and the State successfully opposed) discovery on that issue.   2 App. 621–622.   Third, even if the defense had made a conscious choice not to raise the (then-uncertain) reasons for Sneed's lithium use, that would be irrelevant to the prosecution's duty to correct false testimony "when it appears."   *Napue*, 360 U. S., at 269.

ney general's concession that Sneed received a lithium prescription as treatment for his bipolar disorder.

The family also maintains (and the dissent agrees) that Reed Smith and the independent counsel spent insufficient time interviewing Smothermon. Neither the family nor Smothermon raised that objection before the OCCA, nor does anyone now explain its relevance to the *Napue* analysis. The argument is also unpersuasive on its own terms. Both investigators spoke to Smothermon. When they did, Smothermon did not provide the account she now endorses: that Sneed relayed to her a conversation with Glossip's counsel about Dr. Trombka and lithium. Instead, during a third interview, Smothermon asked the independent counsel "why he thought it was Dr Trombka and not Dr Trumpet the jazz musician and I was making a personal note or something else." App. to Brief for Victim Family Members as *Amici Curiae* 31a. There is no compelling evidence that a fourth or fifth consultation with Smothermon would have yielded materially different results.

The Court-appointed *amicus*, for his part, largely abandons the OCCA's reasoning and focuses instead on ambiguities in Smothermon's notes. *Amicus* maintains that too many inferential steps separate those notes from the conclusion that Sneed lied on the stand and that Smothermon knew it. For example, *amicus* argues that "the parties do not explain the basis for their asserted link between 'Dr. Trumpet?' and Trombka," reiterating Smothermon's earlier statements that she "'is not convinced that Dr. Trombka and "Dr. Trumpet" are the same person.'" Brief for Court-Appointed *Amicus Curiae* 32. As already explained, however, there is ample evidence in the record before this Court supporting the inference that Smothermon knew about Sneed's psychiatric treatment and lithium prescription, including the prison medical record, Dr. Trombka's attestations, and Smothermon's own notes.

Opinion of the Court

Because ample evidence supports the attorney general's confession of error in this Court, there also is no need to remand for further evidentiary proceedings at the OCCA. Indeed, that such proceedings are not necessary is the one point on which Glossip, Oklahoma, *amicus*, and the OCCA unanimously agree. See Tr. of Oral Arg. 108 (*amicus* conceding that "I guess we all agree that [an evidentiary hearing is] not . . . that it's not necessary"). The partial concurrence suggests this Court should nonetheless remand for further proceedings on the ground that the evidence does not remove all doubt that the attorney general's view of the record is correct. *Post*, at 262 (BARRETT, J., concurring in part and dissenting in part). Yet for the reasons already explained, the record establishes a violation of *Napue*. See *supra*, at 246–252. This Court has not required an evidentiary record free of doubt to find a *Napue* violation in any case, much less when an attorney general confesses that his own office erroneously obtained a capital conviction.[11]

C

Finally, the dissent maintains this Court lacks the authority to remand for a new trial, but its analysis proves the contrary. The dissent emphasizes that "'[o]ur only power over state judgments is to correct them to the extent that they incorrectly adjudge federal rights.'" *Post*, at 294 (quoting *Herb* v. *Pitcairn*, 324 U. S. 117, 125–126 (1945)). It further

---

[11] The dissent would order a hearing to provide "the Van Treese family [with] the opportunity to present its case." *Post*, at 303 (opinion of THOMAS, J.). The family has not requested an evidentiary hearing (or participation in one) at any stage before the OCCA and does not request that relief before this Court. Nor has the OCCA ever extended Oklahoma victims' right to participate in criminal proceedings to state postconviction hearings. Cf. *post*, at 303–304. The request to do so here is the dissent's alone. In any event, this Court does not "cast aside the family's interests," on procedural or any other grounds. *Post*, at 304. For the reasons already explained, considering the evidence submitted by the family would not change the outcome. See *supra*, at 255.

agrees that, where a state court relies on a procedural rule whose application turns on "whether federal constitutional error has been committed," *Ake*, 470 U. S., at 75, this Court may remand for a new trial if it "ha[s] confidence that no other state ground could support the decision below," *post*, at 300. Those principles describe this case.

As explained above, the OCCA "incorrectly adjudge[d]" Glossip's "federal rights." *Herb*, 324 U. S., at 126. In doing so, it relied on a procedural rule whose application turned on the merits of a federal claim: "'Where the Attorney General confesses error, [the OCCA] will examine the record, and, if the confession is sustained thereby, and is well founded in law, the conviction will be reversed.'" See *supra*, at 244 (quoting *Bindrum*, 27 Okla. Crim., at 372, 228 P., at 168, and collecting authorities). Here, the attorney general "concede[d] error under *Napue*," 3 App. 978, and the OCCA rejected that confession because it wrongly concluded that no such federal error had occurred. See *supra*, at 244. Because the *Napue* confession was "well founded in law," it follows that "the conviction will be reversed." *Bindrum*, 27 Okla. Crim., at 372, 228 P., at 168. Accordingly, all that remains below is to vacate the conviction, and a new trial follows *a fortiori*.

The dissent concludes otherwise because, in its view, a remand for further consideration of alternative state grounds is mandatory in every case where *Michigan* v. *Long* resolves lingering doubt over the Court's jurisdiction. *Post*, at 295–296. *Long* describes the circumstances under which this Court has jurisdiction to review a state-court judgment; it does not limit the Court's remedial authority over an established federal constitutional violation. Nor does any other precedent support the dissent's rule. That state courts who "grant relief to criminal defendants" under an erroneous interpretation of federal law may later grant relief "as a matter of [more protective] state law," *Kansas* v. *Carr*, 577 U. S. 108, 128 (2016) (SOTOMAYOR, J., dissenting), plainly does not

deprive this Court of the authority to grant relief where it finds a federal violation, contra, *post*, at 295–296; cf. *Arizona* v. *Evans*, 514 U. S. 1, 8 (1995) ("Under [*Michigan* v. *Long*] state courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution").

The dissent inverts this precedent, asserting that state courts should always have another opportunity to identify additional grounds for denying relief, even where this Court has found a federal constitutional violation. Yet there is no reason to allow state courts a second (or third, or fourth) bite at the apple to identify alternative state grounds for their decision in every case involving a dependent ground. The facts as conceded by the attorney general and supported by the record establish a violation of *Napue*. A new trial is the remedy for a *Napue* violation. See *Giglio*, 405 U. S., at 155. Here, this Court has jurisdiction and a *Napue* violation occurred. Thus, Glossip is entitled to a new trial. See *Ake*, 470 U. S., at 86–87 (vacating conviction and remanding case to the OCCA under similar circumstances).

\*          \*          \*

The judgment of the Oklahoma Court of Criminal Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE GORSUCH took no part in the consideration or decision of this case.

JUSTICE BARRETT, concurring in part and dissenting in part.

While I agree with much of the Court's analysis, I would not order the Oklahoma Court of Criminal Appeals (OCCA) to set aside Richard Glossip's conviction. The OCCA did not make factual findings on the most important questions,

and the record is open to multiple plausible interpretations. Consistent with our ordinary practice, the Court should have corrected the OCCA's misstatement of *Napue* v. *Illinois* and remanded this case for further proceedings. 360 U. S. 264 (1959). Instead, the Court has drawn its own conclusions about what the record shows, thereby exceeding its role.

I begin with the common ground. At the threshold, I agree with the Court's jurisdictional holding and therefore join Part II of its opinion. We lack jurisdiction to review a state court's adjudication of federal claims if the state court's decision "rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman* v. *Thompson*, 501 U. S. 722, 729 (1991). But when a state-law ground of decision is intertwined with analysis of a federal question, we will treat the decision as independent only if the state court "make[s] clear by a plain statement" that its resolution of the state-law question does not depend on its resolution of the federal question. *Michigan* v. *Long*, 463 U. S. 1032, 1041 (1983). Though it is a closer question for me than it is for the Court, I agree that the OCCA's opinion does not clear this bar. True, the OCCA rejected Glossip's application based on state-law procedural limits on postconviction relief. But the opinion can be read to say that the OCCA refused to accept the attorney general's waiver of this procedural bar because his confession of error was not "based in law." 2023 OK CR 5, ¶25, 529 P. 3d 218, 226. If that is what the OCCA meant, then its reliance on state law depended on the merits of Glossip's federal claims. After all, if the trial contained federal constitutional error, then the attorney general's confession of error may have been "based in law." Because the opinion lacks a "plain statement" clarifying that the OCCA's reliance on state law was truly independent of its assessment of Glossip's federal claims, the Court rightly proceeds to the merits. *Michigan*, 463 U. S., at 1041.

I also share the Court's view that the OCCA misapplied *Napue*. The OCCA appeared to think that Justin Sneed's testimony "was not clearly false" because he "was more than likely in denial of his mental health disorders." 529 P. 3d, at 227. But for purposes of *Napue*, the question is not whether a witness subjectively thought he was lying—it is whether the prosecution knowingly presented untrue testimony. The OCCA also stated that Sneed's "known mental health treatment evidence" would not have created a "reasonable probability that the result of the proceeding would have been different had Sneed's testimony regarding his use of lithium been further developed at trial." 529 P. 3d, at 227. Yet the OCCA ignored the critical fact that—had the prosecutor, Connie Smothermon, corrected Sneed's testimony—the jury would have learned that Sneed made a false statement on the stand. Sneed's testimony was the primary evidence that the State offered to prove that Glossip planned the murder. Faced with a prosecutor forced to correct her star witness, a juror might have disbelieved Sneed's testimony in its entirety. And if a juror went from belief to disbelief in Sneed, she might have changed her ultimate assessment of whether the State had proved Glossip's guilt beyond a reasonable doubt. So if Sneed really did give false testimony, and if Smothermon really did knowingly allow that testimony to go uncorrected, then Smothermon violated Glossip's due process rights under *Napue*. The OCCA's contrary statements were wrong as a matter of federal law.

I part ways with the Court on what comes next. In exercising our appellate function, it is not our role to find facts; instead, we review the factual findings of lower courts, subject to a deferential standard of appellate review. See *Price* v. *Johnston*, 334 U. S. 266, 291 (1948). This practice makes good sense. This Court is well equipped to answer questions of federal law; it is ill equipped either to determine the credibility of witnesses or to master voluminous trial records. Other actors in our judicial system—including, where

appropriate, state courts like the OCCA—better serve these functions, as our standard of review reflects. In this case, however, the Court has chosen to function as the initial factfinder.

To establish a violation of *Napue*, Glossip must show that (1) Sneed gave false testimony and (2) Smothermon knew that the testimony was false. To make these showings, Glossip relies largely on notes taken by Smothermon, an affidavit from Dr. Trombka, and a "medical information sheet." According to the Court, these documents clearly demonstrate that (1) Sneed lied when he said that he did not know why he had been given lithium and that he had never seen a psychiatrist and (2) Smothermon knew that both of these statements were lies. See *ante*, at 246–248, 255. Thus, the Court concludes, there is no need for the OCCA to make its own factual findings.*

---

*The Court suggests that this shortcut is appropriate because Glossip, the attorney general, the Court-appointed *amicus*, and the OCCA "unanimously agree" that the record is sufficiently developed. *Ante*, at 256. I do not think that this assertion fairly captures the views of either the *amicus* or the OCCA. When asked whether he "object[ed] to an evidentiary hearing," *amicus*—whom we appointed to defend the judgment below in *this* Court—expressed doubt that he "ha[d] standing to object to an evidentiary hearing." Tr. of Oral Arg. 107–108. When pushed on the point, he responded that the current record supports affirmance "based on the evidence that [Glossip has] chosen to present and particularly given that he's now told you *he* wants the case decided on the current record [and] without an evidentiary hearing." *Id.*, at 109 (emphasis added). In other words, *amicus* simply stated that the current record did not support Glossip's claim—not that the record was in any objective sense already fully developed. Moreover, the question here is not only whether further factual development is warranted, but also which court should find facts in the first instance. *Amicus* certainly did not concede that this Court, rather than the OCCA, should play that role on this record. As for the OCCA, its lack of explanation of the facts cannot be divorced from its erroneous view of *Napue*. Nothing in its opinion indicates what it would make of this record evidence if it confronted the relevant questions under *Napue*.

I respectfully disagree. Smothermon's notes, taken during a jailhouse interview of Sneed, consist of the words "on Lithium?" and "Dr Trumpet?" 3 App. 927. These notes are hardly clear, and there are competing explanations of what they mean. Glossip, the Oklahoma attorney general, and the Court argue that they demonstrate Smothermon's knowledge that Sneed had lied about Dr. Trombka's prescribing him lithium for bipolar disorder. See *ante*, at 247–248, 255. The Van Treese *amicus* brief and JUSTICE THOMAS contend that the notes instead reflect Sneed's account of a conversation with Glossip's lawyers, who had asked Sneed whether he had received lithium from a "Dr Trumpet." See *post*, at 272–275, and n. 3 (dissenting opinion). There are other possibilities too: For instance, perhaps Smothermon was confused by references to "Dr Trumpet" and lithium but never investigated the issue further. Neither Dr. Trombka's affidavit nor the attached medical information sheet nor any of the other record evidence discussed by the Court forecloses any of these possibilities.

When the record is susceptible to multiple plausible inferences, this Court should not be in the business of choosing between them. It should have corrected the OCCA's misstatements of federal law and vacated the judgment, leaving next steps—including the decision whether to conduct an evidentiary hearing—to the OCCA. By doing otherwise, the Court has both displaced the OCCA as factfinder and potentially overridden state-law constraints on the OCCA's remedial authority. See *post*, at 293–301 (THOMAS, J., dissenting). Because the Court has exceeded its appellate role, I respectfully dissent in part.

JUSTICE THOMAS, with whom JUSTICE ALITO joins, and with whom JUSTICE BARRETT joins as to Parts IV–A–1, IV–A–2, and IV–A–3, dissenting.

Richard Glossip—a convicted murderer twice sentenced to death by Oklahoma juries—challenges the denial of his fifth

application for state post-conviction relief. Although Glossip won the support of Oklahoma's new attorney general, he failed to persuade either body with authority to grant him relief: The Oklahoma Court of Criminal Appeals (OCCA) denied Glossip's application as both procedurally deficient and nonmeritorious, and Oklahoma's Pardon and Parole Board denied clemency. Because this Court lacks the power to override these denials, that should have marked the end of the road for Glossip. Instead, the Court stretches the law at every turn to rule in his favor. At the threshold, it concocts federal jurisdiction by misreading the decision below. On the merits, it finds a due process violation based on patently immaterial testimony about a witness's medical condition. And, for the remedy, it orders a new trial in violation of black-letter law on this Court's power to review state-court judgments. I respectfully dissent.

I

A

This case arises from the 1997 murder of Barry Van Treese, the owner of an Oklahoma City motel. Beginning in 1995, Glossip began working for Van Treese as the motel's manager. 4 Tr. 182–183 (May 14, 2004). In that capacity, Glossip unofficially hired 19-year-old Justin Sneed to be the motel's handyman. Glossip did not pay Sneed; instead, he let him live at the motel free of charge and occasionally bought him food. *Id.*, at 43–44; 5 Tr. 67–70 (May 17, 2004); 2 App. 644. In late 1996, Van Treese learned of discrepancies in Glossip's accounting suggesting that Glossip had been allowing guests to stay at the motel off the books and pocketing the money for himself. 4 Tr. 63, 68–71 (May 14, 2004); 7 Tr. 35, 39–40, 45–49 (May 19, 2004); 11 Tr. 172–173 (May 25, 2004). During a visit to the motel on January 6, 1997, Van Treese confronted Glossip about this issue, and, having discovered unregistered guests staying at the

motel, he threatened to report Glossip to the police unless Glossip produced receipts for their rooms. 8 Tr. 82 (May 20, 2004).

Hours later, after Van Treese had gone to bed, Sneed entered Van Treese's motel room and repeatedly beat him over the head with a baseball bat. 2 App. 662–664; 11 Tr. 55 (May 25, 2004). Sneed left when he thought that he had killed Van Treese, although the State's forensic pathologist later determined that Van Treese had initially survived the attack, and died several hours later after slowly bleeding out. *Id.*, at 55–57, 61; App. to Response to Petitioner's Succ. Application for Post-Conviction Relief in No. PCD–2022–819 (OCCA), Tr. of Glossip Police Interview 10 (Jan. 9, 1997). Following his arrest, Sneed explained to police that Glossip had urged him to kill Van Treese. 2 App. 645, 660. According to Sneed, Glossip told him that they would both be evicted if Glossip lost his job, and Glossip had promised to pay him $10,000 for carrying out the murder. 12 Tr. 95–96, 98 (May 26, 2004).

Shortly after the attack, Sneed went to Glossip's motel room and informed him that he had killed Van Treese. Tr. of Glossip Police Interview 10 (Jan. 9, 1997). Glossip began directing a coverup. On Sneed's account, Glossip first told Sneed to clean up glass shards from a window that Sneed had broken during the attack. 12 Tr. 122 (May 26, 2004). Glossip also sent Sneed to retrieve about $4,000 in cash from Van Treese's car, and then to abandon the car in a nearby credit union parking lot. *Id.*, at 124, 129. When Sneed returned, the two divided the cash. *Id.*, at 128–129. They then entered Van Treese's room, whereupon Glossip directed Sneed to tape a shower curtain over the broken window and run the air conditioning at full blast to eliminate any odor. *Id.*, at 130, 132. Glossip then dispatched Sneed to buy plexiglass, which the pair installed over the broken window on the morning of January 7. Tr. of Glossip Police Interview

THOMAS, J., dissenting

14–15 (Jan. 9, 1997); 4 Tr. 163–165 (May 14, 2004); 13 Tr. 126 (May 27, 2004).[1]

Glossip took additional steps to cover up the murder. He told multiple witnesses that the window in Van Treese's room was broken because two drunks had stayed there the night before and smashed it in a brawl. 5 Tr. 85 (May 17, 2004); 7 Tr. 64 (May 19, 2004); 9 Tr. 46, 206 (May 21, 2004); 11 Tr. 188–189 (May 25, 2004). He told the housekeeper that she did not need to clean the downstairs rooms—including Van Treese's room. 8 Tr. 122–123 (May 20, 2004). Instead, as Glossip explained to another employee and a motel resident, he and Sneed would cover those rooms. 7 Tr. 64 (May 19, 2004); 9 Tr. 49 (May 21, 2004). Glossip had never taken such steps before. 8 Tr. 122–123 (May 20, 2004). He also told various witnesses that he had seen Van Treese alive and

---

[1] Despite its consistent theme that Sneed's testimony is too implausible to sustain Glossip's conviction, the majority feels the need to bolster its account by finding "inconsisten[cies]" in his testimony that are not genuine. *Ante,* at 234, n. 1. There is no contradiction in Sneed's claims that he committed the murder as part of a robbery and that he did so to avoid being "'evicted if Glossip lost his job.'" *Ibid.* At both of Glossip's trials, Sneed consistently testified that Glossip proposed taking the cash Van Treese had with him *and* that Glossip told him that they would get evicted if he did not kill Van Treese. 12 Tr. 95–96, 98, 124 (May 26, 2004); 6 Tr. 89–90, 95–96 (June 8, 1998). Contemporaneous evidence supports both motivations. In his confession to police, Sneed stated that Glossip had proposed killing Van Treese and taking the cash that Van Treese had with him. 2 App. 675. And, two days after the murder, Glossip told police that Sneed had committed the murder in part because "[h]e thought Barry [Van Treese] was going to throw him out in the street." Tr. of Glossip Police Interview 13 (Jan. 9, 1997). Nor did Sneed ever claim that "he did not know why Glossip wanted him to kill Van Treese." *Ante,* at 234, n. 1. He testified only that he did not know "why Mr. Glossip wanted to kill Mr. Van Treese *on this particular night,*" because "[e]very time that Mr. Van Treese showed up, [Glossip] was wanting me to kill him." 6 Tr. 89 (June 8, 1998) (emphasis added). As noted, Sneed clearly testified at the same trial that Glossip wanted Sneed to kill Van Treese so that they would not be evicted. *Id.,* at 90.

well around 7 o'clock that morning. 4 Tr. 99 (May 14, 2004); 7 Tr. 62–63 (May 19, 2004); 9 Tr. 194 (May 21, 2004); 11 Tr. 126–127, 182–183 (May 25, 2004).

That afternoon, the credit union called the motel to report that Van Treese's car had been abandoned in its parking lot. 7 Tr. 70 (May 19, 2004). At that point, it became clear to the motel's staff that Van Treese was missing. *Id.*, at 72–74. Shortly thereafter, Glossip returned to the motel from a shopping trip, during which he had made several large purchases, including an engagement ring for his girl-friend. *Id.*, at 74; 14 Tr. 41 (May 28, 2004). He then purported to search the rooms and surrounding area for Van Treese. 5 Tr. 97 (May 17, 2004); 9 Tr. 192–193 (May 21, 2004); 11 Tr. 185–186, 190 (May 25, 2004). He even assured Van Treese's wife over the phone that everything was fine and that he had seen Van Treese that morning. 4 Tr. 99–100 (May 14, 2004).

Glossip later repeated to a local police officer the story that two drunks had broken the window and that he had seen Van Treese that morning. 9 Tr. 194, 206–207 (May 21, 2004). Unpersuaded, the officer checked the room with the broken window and discovered Van Treese's body. *Id.*, at 220, 224–225; 11 Tr. 191, 194 (May 25, 2004). Glossip immediately told the officer that he suspected that Sneed had something to do with the murder, explaining that he had heard glass breaking and that Sneed had banged on his door, but he did not claim to know anything more. 9 Tr. 233 (May 21, 2004).

Homicide detectives interviewed Glossip later that night. Tr. of Glossip Police Interview 1, 10–11 (Jan. 8, 1997). He denied knowing that Van Treese had been murdered before the body was discovered. *Id.*, at 70, 86. And, he vacillated between doubting that Sneed was involved and asserting that he likely was. *Id.*, at 27–28, 69–70.

On the morning of January 8, Glossip began to sell all his possessions, telling multiple witnesses that he would like to leave town. 8 Tr. 88 (May 20, 2004); 11 Tr. 199 (May 25,

Page Proof Pending Publication

THOMAS, J., dissenting

2004). On January 9, police picked up Glossip after he failed to appear for a meeting with homicide detectives. 12 Tr. 7 (May 26, 2004). He had $1,757 in cash on his person and no explanation for how he—living paycheck to paycheck and having made only $490 from selling his possessions the previous day—had so much cash. *Id.*, at 12–13; 14 Tr. 43–44 (May 28, 2004); 15 Tr. 17, 93 (June 1, 2004).

Glossip sat for a second interview with homicide detectives later that day. Tr. of Glossip Police Interview 1 (Jan. 9, 1997). This time, although continuing to deny that he had ordered Sneed to kill Van Treese, Glossip admitted that Sneed had told him about the murder just after committing it, and that he had instructed Sneed to clean up the glass and repair the window. *Id.*, at 13–14, 36. Glossip also admitted that Van Treese "was upset because the motel wasn't doing as well as it could." *Id.*, at 32. When asked why he hid the murder, Glossip denied doing so to protect Sneed. He said he covered up the murder instead to protect himself, because he "was involved in it" and risked losing his girlfriend otherwise. *Id.*, at 29–30.

During this interview, Glossip also tried to minimize his involvement in the crime by insisting that he had not gone inside Van Treese's hotel room after the attack. *Id.*, at 18; see also *ante*, at 232 (emphasizing this denial). At trial, however, a motel resident testified that, on the morning of January 7, Glossip had said that he and Sneed had been "in the room" after the window was broken. 9 Tr. 120 (May 21, 2004).

Police arrested Sneed five days later and charged him with capital murder. 2 App. 644–645. He had $1,680 in cash in his possession. 14 Tr. 12–18 (May 28, 2004). At first, Sneed denied involvement, claiming that his brother and Glossip had once discussed the idea but that it never went beyond talk. 2 App. 655–657. Later in the interview, however, Sneed confessed to murdering Van Treese at Glossip's instigation. *Id.*, at 660, 664.

## B

### 1

Glossip was convicted and sentenced to death in 1998, but the OCCA ordered a retrial based on ineffective assistance of counsel.   2001 OK CR 21, 29 P. 3d 597.

At his second trial in 2004, a jury convicted Glossip again, and the judge again sentenced him to death.   Sneed testified against Glossip during the guilt phase, as he had at the first trial.   While Sneed was providing background information about himself at the outset of this testimony, the State's lead prosecutor, Connie Smothermon, asked him whether he had received any "prescription medication" after being arrested. 12 Tr. 63–64 (May 26, 2004).   Sneed responded that he had briefly been prescribed "Lithium for some reason, I don't know why.   I never seen no psychiatrist or anything."   *Id.*, at 64.   The matter did not come up again during the trial.

It would not have been challenging for the parties to deduce the reason for Sneed's lithium prescription.   It is undisputed that lithium's sole medical purpose, both in 1997 and today, is to treat bipolar disorder and other mental health disorders.   See *ante*, at 247.   Were there any doubt about Sneed's condition, records long available to both sides resolve it.   In 1997, Sneed underwent a pretrial competency evaluation with forensic psychologist Dr. Edith King.   Dr. King's report strongly suggested that although Sneed himself may have been in denial, he was taking lithium to treat bipolar disorder or a similar condition.   During his evaluation, Sneed asserted that he "d[id] not think he ha[d] any serious mental problems."   2 App. 701.   And, he reported he was given the lithium, apparently by mistake, "after his tooth was pulled."   *Id.*, at 700.   Dr. King felt otherwise.   Concluding that Sneed qualified as a "mentally ill person or a person requiring treatment," *ibid.*, she determined that he likely had "an atypical mood swing disorder in his past characterized by 'ups and downs' including anger outburst."   *Id.*,

Thomas, J., dissenting

at 702. "His present medication [*i.e.*, the lithium] is probably helping him control his moods." *Ibid.*

The defense was well aware of this report before Glossip's second trial. In fact, on direct appeal of his first conviction, Glossip's appellate counsel had faulted his trial counsel for not using Dr. King's report to show the jury that Sneed was taking lithium to control his anger. 1 *id.*, at 18. Nevertheless, after the OCCA vacated his first conviction, Glossip declined to seek further pretrial discovery on the issue or raise it during his second trial.

After his second conviction and sentence, Glossip ignored the lithium issue on direct appeal, instead raising a general sufficiency-of-the-evidence challenge. The OCCA unanimously rejected that challenge, finding that there was sufficient evidence to convict and that the State had satisfied an additional state-law requirement for corroborative evidence where a conviction rests on accomplice testimony. 2007 OK CR 12, ¶¶47–53, 157 P. 3d 143, 153–154. Two judges dissented on different grounds but "agree[d] with the majority that the State presented a strong circumstantial case against Glossip." *Id.*, at 175 (Chapel, J.); see also *ibid.* (A. Johnson, J.).

2

Glossip has spent the past two decades challenging his conviction and sentence through direct appeal, state and federal collateral proceedings, and civil litigation under Rev. Stat. § 1979, 42 U. S. C. § 1983. Throughout that time, no court has "determined error in [his] trial proceeding" or found that "there [has] been a showing of actual innocence." 2023 OK CR 5, ¶2, 529 P. 3d 218, 229 (Lumpkin, J., specially concurring). And, for almost that entire duration, the Oklahoma attorney general has steadfastly defended the verdict and sentence, insisting that the evidence the State presented in 1998 and 2004 has never "been credibly rebutted." 3 App. 769.

In 2022, as Glossip's execution date approached, a group of Oklahoma legislators opposed to his execution commissioned the law firm Reed Smith LLP to conduct an independent investigation of his case. The firm, which is publicly committed to "fighting the death penalty," *id.*, at 709, n. 3 (alteration and internal quotation marks omitted), issued a final report expressing "grave doubt as to the integrity of Glossip's murder conviction and death sentence," Independent Investigation of *State* v. *Richard E. Glossip* 6 (June 7, 2022) (Reed Smith Report). The attorney general vigorously disagreed. In subsequent post-conviction filings, the State asserted that the report was "built on assumptions, half-truths, and (in some cases) outright falsehoods," 3 App. 769, and criticized its findings at length, see *id.*, at 754–769.

In response to the Reed Smith Report, the attorney general's office released all its files from the case to Glossip, except for one box of attorney work product. Based on this information, Glossip filed a fourth motion for post-conviction relief in the OCCA, raising two overarching claims. The first claim was that the State violated *Brady* v. *Maryland*, 373 U. S. 83 (1963), by withholding evidence that Sneed considered recanting his original testimony before the second trial. The second claim was that Smothermon, the lead prosecutor, committed misconduct and violated the rule of sequestration (which prohibits witnesses from hearing other witnesses' testimony) during trial. After the State's forensic pathologist testified that there was evidence Sneed used a knife in addition to the bat during the murder, Smothermon sent a memorandum to Sneed's attorney highlighting ways in which this testimony was hard to square with some of Sneed's earlier statements. Glossip thus claimed Smothermon violated the rule of sequestration by conveying witness statements for the purpose of coaching Sneed into altering his testimony to fit the forensic evidence. Attorney General John O'Connor opposed the application, urging the OCCA not to be cowed

by the ongoing "public relations campaign" to "falsely" present Glossip as "innocent." 3 App. 717.

The OCCA unanimously denied the application. Under Oklahoma's Post-Conviction Procedure Act (PCPA), Glossip's post-conviction application could not proceed unless he could show (1) that the "factual basis for the claim" was previously unavailable and (2) that, but for the alleged error, no reasonable jury would have convicted him or sentenced him to death. Okla. Stat., Tit. 22, § 1089(D)(8)(b) (2024). The OCCA held that both claims failed the first requirement because they were not based on new information. It also held that Glossip's claims failed on the merits.

As to the recantation claim, the OCCA held that Glossip's first claim was procedurally barred because the defense knew even before the 2004 trial that Sneed was reluctant to testify again. 3 App. 777. In fact, one of Glossip's attorneys had even visited Sneed before trial in an effort to persuade him not to testify. *Ibid.* On the merits, there was "no evidence that Sneed had any desire to recant or change his testimony." *Id.*, at 776. Sneed had even told Reed Smith that " 'recant[ing]' " was " 'impossible because I told the truth.' " *Id.*, at 724. Sneed was reluctant to testify because he wanted to obtain a better plea deal or to avoid the disruption to his life that testifying would cause. *Id.*, at 776.[2]

---

[2] The majority points to a letter from Sneed to his attorney in which Sneed raised the prospect of " " "recanting" " " his trial testimony. *Ante*, at 238 (quoting 3 App. 815). But, in two subsequent interviews with Reed Smith attorneys, Sneed made clear that, although he wanted to avoid testifying again if possible, he continued to stand by the truth of his earlier testimony:

"[REED SMITH ATTORNEY]: Yeah. Well, I think the bottom line here, the most important things that we needed to clarify was like when you're talking about recanting, you're not talking about changing your story about what happened. Have you ever indicated to anybody that you ever wanted to change your story about what happened?

"JUSTIN SNEED: No, sir. I have not ever indicated that I wanted to change the truth of him applying pressure to me." App. to Response to

Turning to the sequestration claim, the OCCA pointed out that Smothermon had acknowledged at trial that she had spoken with Sneed's counsel, so the claim likewise lacked a new factual basis. *Id.*, at 780; see 12 Tr. 107–108 (May 26, 2004). On the merits, the court held that Oklahoma's sequestration statute does not prohibit *counsel* from discussing with a witness other witnesses' testimony. 3 App. 781. Federal courts have similarly interpreted the federal sequestration rule to permit "witnesses . . . to discuss the case" with "counsel for either side." 2A C. Wright & P. Henning, Federal Practice and Procedure § 416, p. 195, and n. 29 (4th ed. 2009) (collecting cases). And, nothing in Smothermon's memorandum indicates she was encouraging Sneed to lie. 3 App. 781–782.

3

In January 2023, Gentner Drummond became Oklahoma's attorney general. During his first month in office, Drummond released the final box of evidence (Box 8) to Glossip. He also appointed Rex Duncan, a personal friend and campaign donor, as independent counsel to reexamine the legitimacy of Glossip's conviction.

Among the materials released in Box 8 were handwritten notes taken by Smothermon and her co-counsel Gary Ackley during a 2003 meeting between them, Sneed, and Sneed's attorney.

_____

Petitioner's Succ. Application for Post-Conviction Relief in No. PCD–2022–819 (OCCA), Tr. of Sneed Reed Smith Interview 46–47 (Aug. 15, 2022).

See also *id.*, Tr. of Sneed Reed Smith Interview 24 (Sept. 7, 2022) ("There isn't any way of really making up some [new] storyline that isn't going to cover all the evidence that is already there . . . "). Sneed has never on any occasion indicated that his testimony that Glossip directed him to kill Van Treese was false, see 3 App. 724–725, and the majority cites no such occasion. The best explanation for Sneed's letter, and the one that the OCCA credited as factual, is thus that Sneed, an eighth-grade dropout, used the phrase "recanting my testimony" imprecisely to mean "refuse to testify." *Id.*, at 725, and n. 13, 776.

Thomas, J., dissenting

Glossip's counsel quickly seized on Smothermon's notes. In the top left corner of the notes, Smothermon had written "on Lithium?" and "Dr Trumpet?" See Figure 1, *infra*. According to Glossip's counsel, these phrases meant that Sneed had admitted during the meeting that he had been prescribed lithium by Dr. Lawrence Trombka, the psychiatrist at the Oklahoma County Jail.

Smothermon and Ackley disagree with this interpretation. They assert before this Court that, during the meeting, Sneed recounted two interviews that he previously had with members of Glossip's defense team. In context, Smothermon's notes simply record that Sneed told her that Glossip's defense team had asked him about his use of lithium and about "Dr Trumpet." The prosecutors claim that this fact is apparent from the other notes on the page and from Ackley's notes, both of which refer to details of these prior interviews. Ackley's notes also highlight the phrase "'tooth pulled.'" 3 App. 940. The prosecutors' interpretation of their own notes thus suggests that Sneed recounted that he had responded to questions about lithium and Dr. Trombka



Figure 1. Smothermon's handwritten notes.   See 3 App. 927.

with his earlier story that he was prescribed lithium in error after having his tooth pulled. This interpretation is explained at great length by the Van Treese family's brief. See Brief for Victim Family Members as *Amici Curiae* 7–22.[3]   And, as of yet, no one—including the par-

———————

[3] According to Smothermon, her notes reflect two visits ("2X") by defense representatives—with notes about the two visits separated by a horizontal line.   According to the notes above the line, Sneed's first visitors were "women," one of whom was an investigator ("invest.") who may have been heavy set ("heavy set?").   These visitors may have been involved in Glossip's earlier direct "appeal."   These women asked Sneed whether he was "on Lithium?" and about a "Dr Trumpet?"   The notes also document a discussion of a "waiver for records," "IQ test," and "GED. VoTech." Similarly, Ackley's notes record that the "W[itness, *i.e.*, Sneed,] was visited by 2 women who said they rep Glossip."   They were "heavy," "1 'Inv.' & 1 'Atty,'" who may have been on Sneed's "Appellate" team.   These two women asked Sneed about lithium ("Li"), and he responded with something about getting his "'tooth pulled.'"   Brief for Victim Family Members as *Amici Curiae* 9–12.

These notes correspond to Sneed's 2001 meeting with Wyndi Hobbs (Glossip's post-conviction counsel) and an investigator named Lisa Cooper, which was documented in the record of Glossip's fourth post-conviction application.   See 3 App. 729–730.   At this meeting, Sneed "'signed releases for juvenile, jail, prison and criminal records,'" *id.*, at 729, which corresponds to the "waiver for records" mentioned in Smothermon's notes. Sneed later wrote a letter to Cooper to ensure that she received information about his participation in a "vo-tech program," *id.*, at 730, which corresponds to the reference to "GED. VoTech."

According to Smothermon's notes below the line, Sneed's second visit was from a "man" named "Burch" who tried to "con [him] out" of giving "testimony" against Glossip.   Burch "gave [Sneed a] case."   Ackley's notes likewise indicate that Sneed "[l]ater" met with "1 guy" named "Burch."   Sneed said of the meeting, '"Basically all he was trying to do was con me out of not [sic] getting onto the stand.'"   Brief for Victim Family Members as *Amici Curiae* 9–13 (alteration in original).

The filings from Glossip's fourth application also recount that Lynne Burch, one of Glossip's attorneys, met with Sneed after the OCCA vacated Glossip's first conviction.   3 App. 731.   Burch told Sneed "'he didn't have to testify'" in Glossip's second trial, and (in line with Smothermon's notes) gave Sneed a case, *State* v. *Dyer*, 2001 OK CR 31, 34 P. 3d 652, holding that the State could not renege on a plea agreement for refusing to testify at a codefendant's second trial.   3 App. 731–732.

ties and the majority—has attempted to refute it on the merits.

Based on Smothermon's notes, Glossip filed a fifth post-conviction application in the OCCA in March 2023. He framed the notes as new evidence of Sneed's previously unknown bipolar disorder. Glossip attached an affidavit from Dr. Trombka stating that he was the only person who would have prescribed lithium while Sneed was in jail. Glossip also attached what appears to be a jail record indicating that Sneed has bipolar disorder. He argued that the State's refusal to produce these notes before trial violated *Brady*, on the theory that he could have used Sneed's condition to impeach his testimony.

At the same time, Glossip recognized that he would need additional evidence to prove his theory. Together with his application, Glossip also filed a motion for an evidentiary hearing, in which he sought to call Smothermon and Ackley as witnesses. Motion for Evidentiary Hearing in No. PCD–2023–267 (OCCA), p. 2. Glossip explained in the motion that "the resolution" of his *Brady* claim "turns in part on interpretation of prosecutors' notes." Motion for Evidentiary Hearing, at 1. "Without their testimony," he acknowledged, "any finding about what they meant or what the attorneys did or did not know when they wrote them would be speculation." *Id.*, at 1–2.

Independent Counsel Duncan, on the other hand, determined that no further evidence was needed. Duncan released his final report shortly after Glossip filed his fifth application. He agreed that the State violated Glossip's *Brady* rights and asserted that Smothermon's failure to correct Sneed's testimony amounted to a due process violation under *Napue* v. *Illinois*, 360 U. S. 264 (1959). Duncan based his conclusions on the speculation that "seasoned capital homicide prosecutors . . . could be expected" to know that "Trumpet" referred to Dr. Trombka and that Dr. Trombka was the psychiatrist at the Oklahoma County Jail. App. to Reply Brief in Support of Pet. for Cert. 23a. He then con-

cluded the report with praise for Drummond, stating that Drummond's "decision to seek a stay of execution and more thoroughly examine this case may be the bravest leadership decision I've ever witnessed." *Id.*, at 30a.

Notably, Duncan failed to give Smothermon a meaningful opportunity to explain what her notes may have meant or what she knew about Sneed's medical history. Instead, he discussed the matter with her only once, during a 3-minute phone call. App. to Brief for Victim Family Members as *Amici Curiae* 31a. Worse, he gave Smothermon no chance to review the decades-old notes before asking her to explain them during the brief call. *Ibid.* Drummond was likewise uninterested in hearing from the attorney he and Duncan were impugning. Following Duncan's report, both Smothermon and the Van Treese family contacted Drummond's office to request that Drummond speak with Smothermon about the notes. *Id.*, at 6a–7a, 71a. Their pleas were ignored.[4]

At the attorney general's behest, the State supported Glossip's post-conviction application. It argued that Smothermon's notes proved that the prosecutors violated *Brady* and *Napue*, and that Glossip was entitled to relief under the State's PCPA. It neglected to address, however, the stringent limitations that the PCPA imposes on such subsequent applications. See § 1089(D)(8)(b).

---

[4] The majority insists that Smothermon had a fair opportunity to explain her notes because she met once with attorneys at the Reed Smith law firm and had an earlier, longer phone call with Duncan. *Ante*, at 255. But, the Reed Smith meeting occurred before the release of Box 8. See Reed Smith Report 80, n. 321 (noting that the Reed Smith meeting occurred in May 2022, eight months before Box 8 was released in January 2023). And—by his own admission—Duncan "forgot to ask" Smothermon about "Dr. Larry Trombka" during his earlier, longer phone call. App. to Brief for Victim Family Members as *Amici Curiae* 32a. The majority also faults Smothermon for not having an explanation ready during the 3-minute phone call. *Ante*, at 255. But, without giving Smothermon an opportunity to review the notes, it was unreasonable to expect her instantaneously to recall their meaning 20 years later.

Thomas, J., dissenting

The OCCA unanimously denied Glossip's fifth post-conviction application. The court first held that Glossip had not satisfied either requirement of § 1089(D)(8)(b), and thus that the *Brady* and *Napue* claims were procedurally barred. 529 P. 3d, at 226. The OCCA then held that both claims also failed on the merits. No *Brady* violation occurred, the court explained, because Sneed's 1997 pretrial competency report already informed the defense of Sneed's prescription and condition. The OCCA determined that defense counsel had likely made a strategic decision not to base a defense on them. 529 P. 3d, at 226. Nor was there any *Napue* violation, according to the court, because Sneed's testimony "was not clearly false" and, in any event, was not material given defense counsel's choice not to raise Sneed's condition. 529 P. 3d, at 226–227. After the OCCA issued its decision, Oklahoma's Pardon and Parole Board denied clemency.

## II

As an initial matter, we lack jurisdiction to review this case. "This Court from the time of its foundation has adhered to the principle that it will not review judgments of state courts that rest on adequate and independent state grounds." *Herb* v. *Pitcairn*, 324 U. S. 117, 125 (1945). "Because this Court has no power to review a state law determination that is sufficient to support the judgment, resolution of any independent federal ground for the decision could not affect the judgment and would therefore be advisory." *Coleman* v. *Thompson*, 501 U. S. 722, 729 (1991). Thus, on direct review of a state-court judgment, the presence of an adequate and independent state ground imposes a "jurisdictional" limitation. *Ibid.* The decision below rests on such grounds, and the majority concludes otherwise only by grossly mischaracterizing the state court's analysis.

## A

The PCPA authorizes a criminal defendant to collaterally challenge his conviction on the ground that it violates the

Federal Constitution. Okla. Stat., Tit. 22, § 1080(1). But, given the extraordinary nature of collateral challenges, the statute also imposes a variety of restrictions on relief. In capital cases, the applicant must establish not just a constitutional violation, but also, among other requirements, that his claim "could not have been raised in a direct appeal" and that "the outcome of the trial would have been different but for the errors or that the defendant is factually innocent." § 1089(C).

The PCPA further bars subsequent applications for relief, such as Glossip's, unless the applicant satisfies two additional requirements. As mentioned, the applicant must show that "the factual basis for the claim" was not previously "ascertainable through the exercise of reasonable diligence." § 1089(D)(8)(b)(1). And, the applicant must demonstrate that "the facts underlying the claim" would, if proved, "establish by clear and convincing evidence that, but for the alleged error, no reasonable fact finder would have found the applicant guilty of the underlying offense or would have rendered the penalty of death." § 1089(D)(8)(b)(2). These two necessary conditions—the diligence and actual-innocence requirements—closely mirror limits that the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) imposes on successive federal habeas petitions. See 28 U. S. C. § 2244(b)(2)(B); *Davison* v. *State*, 2023 OK CR 11, ¶9, n. 1, 531 P. 3d 649, 651, n. 1.

As with other state-law requirements, the PCPA's bar on subsequent applications ordinarily will constitute an adequate and independent state ground precluding our review. It is independent because its application does not "depend upon a federal constitutional ruling on the merits." *Stewart* v. *Smith*, 536 U. S. 856, 860 (2002) (*per curiam*). It is adequate as a general matter because States have no constitutional obligation to create "collateral proceedings" in the first place. *Murray* v. *Giarratano*, 492 U. S. 1, 10 (1989) (plural-

THOMAS, J., dissenting

ity opinion). And, it is adequate in particular cases so long as the OCCA's decision to rely on it is not "so unfounded" in existing law or the record "as to be essentially arbitrary." *Cruz* v. *Arizona*, 598 U. S. 17, 26 (2023) (internal quotation marks omitted). A decision will be inadequate on this basis only in "the rarest of situations." *Ibid.*

Here, the OCCA held that the PCPA barred Glossip's application twice over because he failed to meet *either* the diligence or actual-innocence requirements. 529 P. 3d, at 226. The OCCA properly grounded these conclusions in its analysis of the record: It explained that because Glossip had been aware of Sneed's condition and lithium prescription since 1997, with "reasonable diligence" the *Napue* violation "could have been presented previously." 529 P. 3d, at 226. Likewise, Glossip could not establish that, but for the alleged *Napue* violation, "no reasonable fact finder" would have convicted him. 529 P. 3d, at 226. Correcting Sneed's testimony simply would have furnished the defense with additional impeachment evidence that did not directly contradict the State's basic theory. But, "evidence of factual innocence must be more than that which merely tends to discredit or impeach a witness." *Id.*, at 225 (collecting cases). The OCCA's reliance on the PCPA thus was both an adequate basis for its judgment and independent of federal law, leaving us without jurisdiction. Glossip's case should end here.

B

The majority evades this straightforward conclusion by inventing a federal holding that the OCCA never made. Before applying the PCPA's bar on subsequent applications, the majority contends, the OCCA first addressed the State's "confession of *Napue* error." *Ante*, at 243. The OCCA then found this confession to be " 'not based in law or fact.' " *Ibid.* (quoting 529 P. 3d, at 226). Thus, the majority concludes, the OCCA premised its application of the PCPA's

bar on an "antecedent holding" of "federal law," which we have jurisdiction to review. *Ante*, at 243. This theory misstates the decision below and defies logic.

As the OCCA recognized (and the majority does not), the State did not merely confess to a *Napue* violation; it "concede[d] that [Sneed's] alleged false testimony combined with other unspecified cumulative errors *warrant post-conviction relief.*" 529 P. 3d, at 226 (emphasis added). A federal claim can warrant post-conviction relief under the PCPA only if the applicant meets the PCPA's additional requirements. See § 1089(D)(4). The State partly recognized as much, expressly acknowledging that, "[t]o obtain post-conviction relief, Glossip needs to show" that he satisfies the requirements of "§ 1089(C)." 3 App. 976. The State therefore argued that the alleged *Napue* violation met those requirements— namely, that the violation "could not have been asserted in a direct appeal," and that "the result of the trial" likely would not "have been the same but for" the *Napue* violation and cumulative errors. 3 App. 977–978.

The OCCA properly concluded that this argument suffered a threshold defect: It ignored the PCPA's additional requirements for "subsequent application[s] for post-conviction relief" under § 1089(D). Beyond showing that he met the § 1089(C) requirements, Glossip *also* had to show he satisfied § 1089(D)'s diligence and actual-innocence requirements. § 1089(D)(8)(b). Yet, the State never addressed those prerequisites. The OCCA thus held that Oklahoma's "concession alone cannot overcome the limitations on successive post-conviction review." 529 P. 3d, at 226 (citing § 1089(D)(8)).[5] Because the State's concession that the cir-

_____

[5] The majority claims that the OCCA could not have meant to rely on § 1089(D) because the State "expressly attempted to waive" the requirements of that provision. *Ante*, at 245. The State did no such thing. In its response to Glossip's application, the State of Oklahoma contended that, "[t]o obtain post-conviction relief, Glossip needs to show" he satisfies the

cumstances "warrant post-conviction relief" overlooked these additional state-law requirements, the OCCA correctly observed that the State's assertion was "not based in law or fact." *Id.*, at 226. And, as the OCCA's § 1089(D) citation makes clear, the court was referring to *Oklahoma* law, not *federal* law.

The structure of the OCCA's analysis reinforces this conclusion. The relevant portion of the opinion reads as follows:

> "¶25 Glossip claims that the State failed to disclose evidence of Justin Sneed's mental health treatment and that Sneed lied about his mental health treatment to the jury. Though the State in its response now concedes that this alleged false testimony combined with other unspecified cumulative errors warrant post-conviction relief, the concession alone cannot overcome the limitations on successive post-conviction review. *See* 22 O.S. Supp. 2022, § 1089(D)(8). The State's concession is not based in law or fact.

> "¶26 This issue is one that could have been presented previously, because the factual basis for the claim was ascertainable through the exercise of reasonable diligence, and the facts are not sufficient to establish by clear and convincing evidence that, but for the alleged error, no reasonable fact finder would have found the

——————

PCPA. 3 App. 976 (citing § 1089(C)). It then offered an *argument* that Glossip had satisfied the PCPA's requirements. *Id.*, at 976–978. Such an argument is distinct from a "waiver," which "is the voluntary and intentional relinquishment of a known right." *Price* v. *Zhang*, 2022 OK 95, ¶19, 521 P. 3d 795, 799–800. Regardless, even if the State had purported to waive § 1089(D), the OCCA nonetheless explicitly applied it. 529 P. 3d, at 226 (citing § 1089(D)(8)). Perhaps the majority thinks that ruling is too harsh—even though AEDPA's analogous limitations on successive federal habeas petitions are often, if not always, unwaivable. See *Burton* v. *Stewart*, 549 U. S. 147, 157 (2007) (*per curiam*). But, the *harshness* of such a ruling would not make it any less *independent* of federal law.

applicant guilty of the underlying offense or would have
rendered the penalty of death.

"¶27 [Glossip's *Brady* claim fails on the merits.]

"¶28 The evidence, moreover, does not create a *Napue*
error. . . ." *Id.*, at 226–227 (footnotes omitted).

The OCCA's application of § 1089(D)'s diligence and actual-
innocence requirements in paragraph 26 immediately fol-
lowed its "law or fact" comment in paragraph 25. Only
thereafter in paragraph 28 did the court turn to the State's
*Napue* claim and conclude that "[t]he evidence, moreover,
does not create a *Napue* error." 529 P. 3d, at 226 (footnote
omitted). This structure leaves no doubt that § 1089(D)'s re-
quirements are why the State's concession failed: The appli-
cation of § 1089(D) in paragraph 26 explained the immedi-
ately preceding statement that the "State's concession is not
based in law or fact." The merits discussion in paragraph
28 was a follow-on, alternative holding.

The majority's alternative interpretation is incoherent.
According to the Court, the OCCA's analysis proceeded as
follows: *First*, the court asserted that the State's "concession
alone cannot overcome the limitations on successive post-
conviction review," and expressly cited § 1089(D)'s diligence
and actual-innocence requirements. *Ibid.* *Second*, the
OCCA without explanation switched—in the very next sen-
tence—to the merits and decided the *Napue* question in a
single, conclusory assertion that the "State's concession is
not based in law or fact." 529 P. 3d, at 226. *Third*, after
summarily deciding the merits of a federal constitutional
claim, the OCCA toggled back to the procedural bar in the
very next paragraph to explain why Glossip failed to meet
the PCPA's procedural requirements. *Fourth* and finally,
the OCCA circled around to spell out its "antecedent" *Napue*
merits holding. *Ante*, at 243. This reading is as convoluted
and implausible as it sounds. If "the only reason" § 1089(D)
applied had been because the *Napue* claim independently

failed on the merits, there would have been no point in discussing § 1089(D) in the first place. *Ante*, at 243.

Finally, the majority cannot fall back on *Michigan* v. *Long*, 463 U. S. 1032 (1983), which establishes a presumption that a state court has based its decision on federal law when it is "insufficiently 'clear from the face of the opinion'" that the court meant to rely on an independent state-law ground. *Ante*, at 245 (quoting 463 U. S., at 1040–1041). Here, the OCCA expressly held that § 1089(D) barred any relief based on *Napue*. 529 P. 3d, at 226. That leaves the "face of the opinion" as "clear" as it gets. *Long*, 463 U. S., at 1041. The majority's tortured reading of the OCCA's "law or fact" phrase is too farfetched to undermine the force of that "plain statement" that state law resolved the case. *Ibid.*

### C

Unable to make a plausible case from the four corners of the opinion below, the majority attempts to bolster its reading by relying on "Oklahoma precedent involving confessions of error." *Ante*, at 243. In particular, in a series of decisions issued between 54 and 106 years ago, the OCCA held that a confession of error must have "a basis in the law and in the record" to be sustained. *Ante*, 244, and n. 6. According to the majority, these decisions establish that whenever the State identifies that a federal constitutional error occurred, all independent legal grounds for sustaining the judgment disappear. *Ante*, at 243–245.

We disapproved of the majority's method of finding jurisdiction in *Long*. There, we decided that, as a general matter, we would no longer "decide issues of state law that go beyond the opinion that we review" to determine whether a judgment rests on an adequate and independent state ground. 463 U. S., at 1040. We adopted this practice because the "process of examining state law" ourselves "requires us to interpret state laws with which we are generally unfamiliar, and which often . . . have not been discussed at

length by the parties." *Id.*, at 1039. That concern is on full display here: Not a single merits brief in this case cites any of the decisions invoked by the majority for its grand theory of confessions of error under Oklahoma law; the majority developed it entirely *sua sponte.* Despite wrapping itself in the mantle of *Long*, the majority disregards one of its central teachings.

If we are to look at other OCCA decisions, I would start with history that is more recent and more on point. In response to Glossip's fourth application for post-conviction relief, the State explicitly "waive[d] its right to argue the claims within this . . . application are waived" under the PCPA. 3 App. 717–718. But, the OCCA refused to accept the waiver, holding that "[t]his Court alone will determine whether the rules of this Court should be abandoned." *Id.*, at 775; see also *ante*, at 238. The OCCA thus made clear that it would apply the PCPA's procedural bars whether the State wanted it to or not. It makes no sense to say, just months later—and in the same case—that the OCCA reversed course without explanation and decided that § 1089(D) becomes irrelevant when the State supports the applicant's claim for relief (while at the same time holding that § 1089(D) applies). See *ante*, at 245. It should go without saying that a decision issued *five months* before the decision below *in Glossip's own case* sheds far more light on what the OCCA meant than decisions issued in *different* cases a *century* ago.

In any event, the majority vastly overreads the case law it cites. The decisions establish the modest point that a confession of error does not automatically entitle a defendant to relief; rather, the OCCA will independently "examine the record" to ensure that the confession is "well founded in law." *Raymer* v. *State*, 27 Okla. Crim. 398, 228 P. 500 (1924) (syllabus by the court); see *ante*, at 243–244, and n. 6. Of course, a confession *that post-conviction relief is warranted* is not well founded if the PCPA bars relief. And, those decisions nowhere hold that procedural bars that might render an

Thomas, J., dissenting

error harmless become irrelevant whenever the State confesses error.

This Court follows the same rule, derived from early English practice, that it must "examine independently" confessions of error before reversing. *Young* v. *United States*, 315 U. S. 257, 258–259 (1942) (citing *Rex* v. *Wilkes*, 4 Burr. 2527, 2551, 98 Eng. Rep. 327, 340–341 (K. B. 1770)). And, this Court applies independent bars to relief even when the Government confesses error. See, *e. g.*, *Grzegorczyk* v. *United States*, 597 U. S. 937 (2022) (statement of KAVANAUGH, J., joined by ROBERTS, C. J., and THOMAS, ALITO, and BARRETT, JJ., respecting denial of certiorari) (rejecting the Government's confession of error and request for vacatur of the judgment below because the defendant's guilty plea waived his claim). Yet, the majority here foists upon Oklahoma essentially the opposite rule by requiring reversal based on errors a court has not independently ruled to be reversible. There is no basis to infer from the OCCA's *duty* to independently examine confessions of error that it will ignore independent grounds for upholding a conviction.

The Court's detour into state-law materials whose consideration *Long* strongly discouraged does nothing to undermine the straightforward conclusion that the decision below invoked §1089(D)'s procedural bar as a hurdle independent of the *Napue* claim's merits. That adequate and independent state ground bars our review of this case.

## III

Even if we had jurisdiction, we could not grant relief because Glossip has failed to show that he is entitled to a hearing on the merits of his *Napue* claim.

*Napue* establishes that "a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." 360 U. S., at 269. If a witness gives false testimony, which the prosecutor knows to be false but fails to correct, then a new trial is warranted if there is "any reason-

able likelihood" that the false testimony could "have affected
the judgment of the jury." *Id.*, at 270–271. A *Napue* claim
therefore requires three elements: falsity, prosecutorial
knowledge, and materiality. Here, the OCCA correctly
held, at minimum, that the *Napue* claim fails the material-
ity requirement.[6]

---

[6] Because the OCCA did not address whether the prosecutors knew that
Sneed's testimony was false, our review of the knowledge element is espe-
cially improper. The rule that "we are a court of review, not of first
view," *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005), applies with
special force to such a fact-intensive question. The OCCA, which has
resolved two direct appeals and five post-conviction applications over two
decades of appeals in this case, is far more steeped in the relevant facts
than this Court. And, it is at least entitled to apply Oklahoma's reticu-
lated post-conviction evidentiary standards in the first instance. See
Okla. Stat., Tit. 22, §1089(D)(4)(a)(1); OCCA Rule 9.7(D) (2024). The ma-
jority's analysis well illustrates our comparative disadvantage, as it over-
reads silence and ignores explicit contrary evidence in an effort to leap
across its inferential gaps. For example, Smothermon's notes say nothing
about bipolar disorder or psychiatry. So, even if Sneed said Dr. Trombka
prescribed the lithium, that is no justification for inferring that he commu-
nicated the reason for the prescription or the fact that Dr. Trombka is a
psychiatrist. Further, we cannot assume that Smothermon already knew
who Dr. Trombka was at the time of the meeting. In fact, the evidence
suggests the opposite; Smothermon clearly did not understand to whom
Sneed was referring given that she mistook his name for "Trumpet?"
See Figure 1, *supra*. Finally, the Court overlooks the affidavit submitted
*by Glossip* from Gary Ackley. It attests that, according to Ackley's con-
temporaneous notes of the meeting, Sneed said something about his
"'tooth'" being "'pulled,'" 3 App. 940, which is how he said he was mistak-
enly prescribed lithium in Dr. King's report, see 2 *id.*, at 700. Ackley also
did "not recall knowing or discussing with anyone that Justin Sneed was
on lithium at any time as treatment for bipolar disorder." 3 *id.*, at 940.
  The majority dismisses the significance of Sneed's "tooth pulled" com-
ment on the ground that Ackley "knew lithium was not a pain medication."
*Ante*, at 248, n. 8. But, whether or not Sneed *in fact* received lithium in
connection with his tooth being pulled, the fact that Sneed *said* something
to that effect strongly undermines the supposedly "straightforward infer-
ence . . . that Sneed told Smothermon that Dr. Trombka had prescribed
him the lithium." *Ante*, at 248. Sneed's disputed testimony is not that
he received lithium to treat a toothache; it is that he had "never seen" a

Thomas, J., dissenting

### A

The OCCA held that Sneed's allegedly false statements—that he had "never seen" a psychiatrist and did not "know why" he was given lithium—were not material because the defense already had reason to know about Sneed's condition but made a strategic decision not to make an issue of it.    529 P. 3d, at 226–227.    That holding is correct.

The "touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial."    *Smith* v. *Phillips*, 455 U. S. 209, 219 (1982).    "Even in cases of egregious prosecutorial misconduct," we have granted relief "only when the tainted evidence was material to the case." *Id.*, at 220, n. 10.    To that end, the proper inquiry is whether "'*the false testimony*'" could have "'affected the judgment of the jury.'"    *Giglio* v. *United States*, 405 U. S. 150, 154 (1972) (emphasis added); see also *Napue*, 360 U. S., at 269 (due process violation occurs where the State "use[s] false evidence . . . to obtain a tainted conviction").

There is no reasonable likelihood that Sneed's challenged testimony changed the jury's verdict, because it did not bear on any contested issue.    As early as 1997, the defense knew that Sneed likely suffered from an "atypical mood swing disorder" that involved "anger outburst[s]," and that his lithium prescription helped to treat it.    2 App. 699–700, 702–703; see also *ante*, at 247 (agreeing that "Glossip had access" to Sneed's pretrial competency report).    On direct appeal from his first conviction, Glossip's counsel identified his use of "lithium" to "'not to feel so angry'" as "vital evidence to attack Sneed's credibility and the State's specious theory of the case."    1 App. 18.

Nonetheless, the defense elected not to raise Sneed's mental condition at the second trial.    Given defense counsel's awareness of the pretrial competency report, this choice

---

psychiatrist and did not "know why" he was given lithium.    12 Tr. 64 (May 26, 2004).

must have been a conscious one. Perhaps, as the OCCA suggested, the defense was concerned that highlighting "Sneed's mental health" could have the counterproductive effect of "showing that he was mentally vulnerable to Glossip's manipulation and control." 529 P. 3d, at 226. Or, perhaps the defense believed it would not be credible to argue that Sneed acted on impulse in a manic state, given other witnesses' testimony that Sneed possessed a consistently mild-mannered disposition. See, *e. g.*, 7 Tr. 26 (May 19, 2004); 9 Tr. 17–18 (May 21, 2004). Whatever the reason, the defense chose not to turn Sneed's mental health into an impeachment issue. That left no work for Sneed's challenged testimony to do, so it could not reasonably have affected the jury's verdict. See *Napue*, 360 U. S., at 269.

The majority concludes otherwise only by redefining the *Napue* materiality inquiry. In its view, Sneed's testimony is material because the jury's verdict could have changed "[h]ad the prosecution corrected" the testimony. *Ante*, at 248. Thus, even "wholly irrelevant" testimony that had no impact on the jury can be material, so long as *the act of correcting it* might have caused the jury to doubt the witness's credibility. *Ante*, at 249. We have never defined materiality in these terms. Rather, we have consistently framed the issue as whether "the false testimony" itself "had an effect on the outcome." *Napue*, 360 U. S., at 272. Thus, the relevant inquiry under *Napue* is whether the *content* of the false testimony at issue is material. Were the test for materiality whether a counterfactual correction of a false statement might tend to undermine the witness's credibility, the materiality requirement would be meaningless in a great number of cases.

*Napue* itself illustrates this point. The "principal state witness" in that case "testified . . . that he had received no promise of consideration in return for his testimony" when the prosecutor "had in fact promised him consideration" in the form of support for a reduced sentence. *Id.*, at 265–266.

The Court did not find this false testimony material merely because such testimony generally undermines a witness's credibility. Rather, the Court took issue with the content of the testimony: "Had the jury been apprised of the true facts, . . . it might well have concluded that [the witness] had fabricated testimony in order to curry the favor of the" prosecutor. *Id.*, at 270; see also *Wearry* v. *Cain*, 577 U. S. 385, 393–394 (2016) (*per curiam*) (similarly finding false testimony material because it concerned whether the witness was receiving favorable treatment in exchange for testimony); *Giglio*, 405 U. S., at 154–155 (same).

Rather than base its holding on *Napue*'s actual discussion of materiality, see 360 U. S., at 270–272, the majority seizes on a line from a different section of the opinion: that "'"[a] lie is a lie, no matter what its subject."'" *Ante*, at 249, 253 (quoting 360 U. S., at 269–270). But, the majority omits the second half of the sentence: "'*and, if it is in any way relevant to the case*, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth.'" *Id.*, at 270 (emphasis added). Read in its entirety, the sentence makes clear that the prosecutor's "'duty to correct'" is triggered only if the false statement "'is . . . relevant to the case.'" *Ibid.* That specification is inconsistent with the majority's conception of *Napue*, under which *any* known false statement triggers the duty to correct, and then the question of materiality turns on a counterfactual inquiry into whether the failure to correct could have affected the outcome of the trial.[7]

──────────
[7] The full context of *Napue*'s materiality discussion further underscores the decision's emphasis on the content of the false testimony rather than the effect of a counterfactual correction:

"Had the jury been apprised of the true facts, however, it might well have concluded that Hamer [the witness] had fabricated testimony in order to curry the favor of the very representative of the State who was prosecuting the case in which Hamer was testifying, for Hamer might have believed that such a representative was in a position to implement (as he ultimately attempted to do) any promise of consideration. That the

The majority's novel approach also unmoors the *Napue* materiality standard from its theoretical justification. This Court applies a defendant-friendly standard of materiality to *Napue* claims "because they involve a corruption of the truth-seeking function of the trial process." *United States* v. *Agurs*, 427 U. S. 97, 104 (1976). Where the jury does not rely on the false testimony because it is irrelevant, no such corruption occurs.

### B

In any event, the majority fails its own test. Even framing the question as whether a *correction* could have affected the outcome of trial, the parties have not established materiality.

*First*, irrespective of whether Sneed lied, prosecutorial correction of his testimony would not have led the jury to infer that he had consciously committed perjury. The far more plausible inference would have been that Sneed simply misremembered—like numerous other witnesses in the same trial. Recall that Glossip's second trial took place seven years after the events in question and six years after his first trial. Many key witnesses in Glossip's second trial testified in his first, leaving them open to impeachment on any details they remembered differently six years later.

The record is replete with instances of counsel—including the prosecutors—reminding the State's witnesses of facts they had forgotten or misremembered. See, *e. g.*, 5 Tr. 90 (May 17, 2004); 7 Tr. 83–85 (May 19, 2004); 8 Tr. 40–42 (May 20, 2004); 9 Tr. 100 (May 21, 2004); 10 Tr. 31 (May 24, 2004);

---

Assistant State's Attorney himself thought it important to establish before the jury that no official source had promised Hamer consideration is made clear by his redirect examination, which was the last testimony of Hamer's heard by the jury:

.     .     .     .     .

"[O]ur own evaluation of the record here compels us to hold that the false testimony used by the State in securing the conviction of petitioner may have had an effect on the outcome of the trial."  360 U. S., at 270–272.

14 Tr. 18 (May 28, 2004). Moreover, Sneed took lithium for only a brief period in 1997. Considering that this testimony held no significance for any contested issue at trial, in this environment there is no reason to think its correction would have been noteworthy, much less the voilà moment the majority imagines.

*Second*, correcting Sneed's allegedly false statements would not have led the jury to believe that Sneed's mental condition led him to attack Van Treese on his own initiative. To begin with, the prosecution had no *Napue* obligation to disclose that Sneed had bipolar disorder. *Napue* requires prosecutors "to correct" what they know to be "false testimony," not to proactively identify impeachment material. 360 U. S., at 265. At most, the only false statement was Sneed's assertion *that* he had not seen a psychiatrist. The OCCA found Sneed "was more than likely in denial of his mental health disorders." 529 P. 3d, at 227. This factual finding has record support. Sneed asserted during his pretrial competency evaluation that he "does not think he has any serious mental problems." 2 App. 701. That statement predated his plea agreement and so cannot be chalked up to trying to maintain his credibility on the stand. The OCCA thus reasonably found Sneed's statement about his own knowledge was not false. Nor did Sneed testify that he was given lithium to treat a cold. See *ante*, at 253. He said only that "shortly after" he had asked for Sudafed he was given lithium for a "reason" that he "d[id]n't know." 12 Tr. 64 (May 26, 2004). Sneed thus never falsely testified as to *why* he received lithium. And, without knowing why a psychiatrist prescribed lithium to Sneed, a lay jury would not likely be able to attribute much significance to the mere fact *that* a psychiatrist did so.

Regardless, there is no reason to think that disclosing Sneed's bipolar disorder would have affected the outcome of the trial. Glossip's defense team was well aware of Sneed's condition and chose not to use it as impeachment evidence.

As appellate judges examining a cold record 20 years after the trial, we should be wary of believing that we understand the import of evidence better than Glossip's counsel. Moreover, the defense made no effort in its questions and argumentation to lay the groundwork for a theory that Sneed acted on a manic impulse. So, it is hard to see why the jury would have developed any theory on its own from a cursory mention of the condition.

*Finally*, the Court cannot rescue its materiality analysis by invoking the cumulative-error doctrine. The Court asserts with virtually no legal analysis that various other violations of state and federal law undermine confidence in the verdict. *Ante*, at 250–251. But, the cumulative-error doctrine applies only if there are multiple *errors* to consider cumulatively. See *Wearry*, 577 U. S., at 394 (only "wrongfully withheld" evidence can be assessed cumulatively under *Brady* and *Napue*); *Hanson* v. *Sherrod*, 797 F. 3d 810, 852 (CA10 2015) ("We cumulate error only upon a showing of at least two actual errors"). The OCCA held that the remaining claims of error the Court asserts are either procedurally barred, meritless, or both. See 529 P. 3d, at 227; 3 App. 776–783; No. PCD–2022–589 (OCCA, Nov. 10, 2022), p. 11; *supra*, at 270–272. We did not grant certiorari to review the correctness of those decisions, so they are not properly before us. See Pet. for Cert. i.

In all events, the other claimed violations are meritless or beyond our jurisdiction. The State's supposed violation of the rule of sequestration is a state-law issue over which we have no jurisdiction. See 3 App. 780–781.[8] The evidence-

---

[8] The majority insists that the alleged violation of the rule of sequestration is more than a state-law issue, *ante*, at 251, n. 9, but for support it offers only a case discussing "the ethical limits on guiding witnesses" as defined by the American Bar Association's model professional responsibility code for States, see *Geders* v. *United States*, 425 U. S. 80, 90, and n. 3 (1976). Moreover, although the State has confessed a violation of "the rule of sequestration" (without addressing the OCCA's earlier, contrary decision, see *supra*, at 272), it has *not* conceded that Smothermon improperly influenced Sneed's testimony, see Brief for Respondent 13; 3 App.

destruction claim is the majority's own creation. Although both parties mention alleged evidence destruction in the background statements of their briefs, neither argues to this Court that any destruction of evidence amounted to a violation of federal law militating in favor of reversal. See Brief for Petitioner 33–38; Brief for Respondent 30–31. So too, there is no evidence that Sneed wished to "recant" his testimony, *ante*, at 251; to the contrary, Sneed explained to Reed Smith that "recant[ing]" was "impossible because I told the truth," 3 App. 724 (internal quotation marks omitted); see also n. 2, *supra* (further explaining that Sneed has never denied the truth of his testimony against Glossip). And, the claim that Glossip sold his couch and television for $900 on January 8—thus suggesting an alternative source for the money he stole from Van Treese—is a nonstarter: Glossip himself testified under oath that he received only $490 for those items and others. 15 Tr. 17 (June 1, 2004).

In short, even setting aside our lack of jurisdiction, Glossip still lacks a valid *Napue* claim because Sneed's allegedly false testimony was immaterial.

## IV

Having erred in both its threshold and merits analyses, the majority rounds out its opinion with an indefensible remedial decree. Rather than vacate the decision below, the majority takes the remarkable step of requiring a new trial. *Ante*,

---

978. Such a claim is utterly unsupported. Glossip initially based this accusation on "handwritten notes" found in a copy of Smothermon's letter to Sneed's attorney, which Glossip claimed were instructions from Smothermon on what Sneed was to say at trial. See Pet. for Cert. in No. 22–6500, p. 20. But, Glossip now concedes that those notes came from Sneed's attorney, not Smothermon. Brief for Petitioner 13, n. 4. Despite this concession, the majority asserts that Smothermon acted improperly when she stated at trial that, although she had spoken with Sneed's attorney, she had never before heard him claim that he had attempted to stab Van Treese in the chest. *Ante*, at 251–252, n. 9 (citing 12 Tr. 107–108 (May 26, 2004)). The majority offers no evidence to suggest that this statement was false. Yet, it insists on deeming Smothermon's conduct a serious ethical breach.

at 256–258. But, whether Glossip is entitled to a new trial turns on several unresolved questions of state law that this Court has no authority to disregard or decide for itself. And, at the very least, Glossip cannot show that he is entitled to relief without an evidentiary hearing.

## A

Even if the majority is correct that this Court has jurisdiction and that the OCCA misapplied *Napue*, the appropriate remedy is to remand for further proceedings. This Court has no authority to order a new trial.

### 1

This Court cannot order a new trial unless federal law *required* the OCCA to do so in the decision below. "It is beyond dispute that we do not hold a supervisory power over the courts of the several States." *Dickerson* v. *United States*, 530 U. S. 428, 438 (2000). "Our only power over state judgments is to correct them to the extent that they incorrectly adjudge federal rights." *Herb*, 324 U. S., at 125–126. Even when a federal question gives this Court jurisdiction to review a state-court judgment, "State courts" remain "the only proper tribunal" for "the decision of questions" in the case "arising under their local law." *Murdock* v. *Memphis*, 20 Wall. 590, 626 (1875). Thus, when a state court's judgment rests on an erroneous interpretation of federal law, this Court must "either render such judgment here as the State court should have rendered, or remand the case to that court, as the circumstances of the case may require." *Id.*, at 636. It has no authority to order relief that the state court could legitimately have refused. And, naturally, we cannot determine what judgment "the State court should have rendered" if doing so requires resolving questions of state law beyond our jurisdiction. *Id.*, at 626, 636. In such cases, remand is the only legitimate disposition. *Id.*, at 636.

Our customary practice reflects these principles. "Normally the Supreme Court, when reversing a state court judgment, remands the case for proceedings 'not inconsistent' with the Court's opinion. The state court is therefore free to resolve any undecided questions or even to alter its determination of underlying state law." W. Baude, J. Goldsmith, J. Manning, J. Pfander, & A. Tyler, Hart and Wechsler's The Federal Courts and the Federal System 634 (8th ed. 2025) (Hart & Wechsler); accord, S. Shapiro, K. Geller, T. Bishop, E. Hartnett, & D. Himmelfarb, Supreme Court Practice § 3.27, p. 3–94 (11th ed. 2019). The Court usually refrains from directing a specific form of relief even when reversing decisions made on direct appeal of a criminal conviction, with no apparent issues of state law remaining to be decided. See, *e. g.*, *Counterman* v. *Colorado*, 600 U. S. 66, 82–83 (2023); *Oklahoma* v. *Castro-Huerta*, 597 U. S. 629, 656 (2022); *Hemphill* v. *New York*, 595 U. S. 140, 156 (2022).

The Court today instead "remand[s] the case for a new trial." *Ante*, at 231. This step would be unusual even on direct review. In the context of a successive motion for post-conviction relief in a state-law regime replete with specialized procedural requirements, it is without precedent. And, more importantly, the majority's directive exceeds the limits on this Court's jurisdiction. For at least three reasons, state-law questions prevent this Court from holding that the OCCA should have granted Glossip a new trial below.

*First*, the majority's jurisdictional holding necessarily leaves open state-law questions for the OCCA to address on remand. The Court finds jurisdiction by invoking the *Long* presumption that a state court "reli[es] on federal law" when it is "insufficiently 'clear from the face of the opinion'" that its decision rests on state law. *Ante*, at 245 (quoting 463 U. S., at 1040–1041). But, the *Long* presumption is just

that—a presumption. When this Court invokes it, state courts "remai[n] free" to "'reinstat[e] their prior judgments after clarifying their reliance on state grounds.'" *Arizona* v. *Evans*, 514 U. S. 1, 8, and n. 3 (1995); see also *Kansas* v. *Carr*, 577 U. S. 108, 128 (2016) (SOTOMAYOR, J., dissenting) (recognizing that, when this Court relies on the *Long* presumption, the "lower court is able to reinstate its holding as a matter of state law"). "Even when the Supreme Court does review an ambiguous decision and reverses on the federal issue, the state courts retain the power on remand to consider independent state-law grounds and, indeed, to rely on such grounds in reinstating their initial judgment." Hart & Wechsler 672. The OCCA is therefore entitled to clarify that it meant to invoke § 1089(D)'s bar on subsequent applications even accepting the majority's *Napue* analysis. The majority's contrary directive ignores settled law.

This error is no mere technical violation. It erases an essential component of the *Long* presumption, which is meant to "preserve the integrity of federal law" *and* to "provide state judges with a clearer opportunity to develop state jurisprudence unimpeded by federal interference." 463 U. S., at 1041. Presuming a federal basis for ambiguous decisions ensures that States cannot evade federal review by obfuscation. At the same time, allowing for clarification on remand preserves state courts' freedom to develop and apply their own law as they see fit. We have even said that reversing under the *Long* presumption makes state courts "freer" to develop their own law because they can do so while "disabused of [an] erroneous view of what the United States Constitution requires." *Evans*, 514 U. S., at 8. In contrast, under the majority's approach, ambiguity in the decision below gives this Court license to vaporize any independent state grounds that it does not like, no matter how clearly they ought to apply as a matter of state law. This sort of federal power grab dishonors our dual system of state and federal courts.

*Second*, even setting aside § 1089(D)(8), there are several potential independent state-law grounds for denying relief that the OCCA has not yet considered. Where there is "a *possible* adequate and independent state ground" for the decision below that "was not addressed by the state court," "the state court may address th[e] question on remand." *California* v. *Ramos*, 463 U. S. 992, 997–998, n. 7 (1983). Indeed, the "settled rule" is that "the Supreme Court will remand to permit the state court to resolve the undetermined state law issue." Hart & Wechsler 655. "The state court remains free to reinstate its prior judgment on that state-law ground." *Ibid.* (collecting cases of reinstatement); see also *Smith* v. *Texas*, 550 U. S. 297, 325 (2007) (ALITO, J., dissenting) ("[I]n cases in which this Court has reversed a state-court decision based on a possible federal constitutional violation, it is not uncommon for the state court on remand to reinstate the same judgment on state-law grounds" (collecting cases)). Here, several potential grounds for reinstating the decision below are apparent.

To begin, the alleged *Napue* violation may be harmless under the PCPA's prejudice standard. See § 1089(C)(2). Below, the OCCA recognized that this standard required Glossip to prove that preventing the errors he alleged "would have changed the outcome" of the trial. 529 P. 3d, at 224; see § 1089(C)(2). In its confession of error, the State also agreed that "Glossip needs to show . . . that the outcome of the trial would have been different." 3 App. 976 (citing § 1089(C)). The OCCA had no occasion to consider this standard, however, because it concluded that any false testimony would have been immaterial under the federal no-reasonable-probability standard. See 529 P. 3d, at 227. The Court today applies that standard and disagrees. *Ante*, at 248–252. But, no court has yet applied § 1089(C)(2)'s higher—and concededly applicable—standard. The OCCA should have the chance to do so on remand.

In addition, in the proceedings below, only the State argued that there was a *Napue* violation, and it is unclear whether the State can raise a claim on a defendant's behalf. See § 1089(A) (assuming that an "application for postconviction relief" comes from "a defendant"). Nor is it clear that the State timely raised its *Napue* objection. State law required Glossip to file his application within 60 days of the State's disclosure of Box 8. See OCCA Rule 9.7(G)(3). Glossip met that deadline. The State did not. See 3 App. 973 (response dated 69 days after disclosure of Box 8). Thus, any *Napue* claim is at least arguably untimely. And, there may be more state-law issues for the OCCA to consider of which we are unaware simply because we are unfamiliar with Oklahoma's highly specialized post-conviction procedure.

*Third*, even if state law does not bar Glossip's *Napue* claim entirely, state law appears not to authorize a new trial as the remedy for a violation at this stage. Cf. *Price* v. *Georgia*, 398 U. S. 323, 332 (1970) (remanding after finding petitioner's conviction unconstitutional because petitioner's precise remedy turned "upon the construction of several Georgia statutes and on the power of Georgia courts to fashion remedial orders" "under Georgia law"). The PCPA authorizes only two dispositions of a capital post-conviction application when it is first filed with the OCCA: denial, or remand to the trial court for a merits determination. §§ 1089(D)(4) and (5). The OCCA has made clear that the Act does not authorize vacating the applicant's conviction or sentence at that initial stage, for "affidavits and evidentiary materials filed in support of a post-conviction application are not part of the trial record but are only part of the capital post-conviction record." *Slaughter* v. *State*, 2005 OK CR 2, ¶11, 105 P. 3d 832, 835. "As such, those affidavits and evidentiary materials *are not reviewed on their merits* but are reviewed . . . '[t]o determine if a threshold showing is met to require a review on

the merits.' "   *Ibid.* (quoting OCCA Rule 9.7(D)(1)(a); emphasis added).

In this respect, the OCCA's initial review of capital post-conviction proceedings is analogous to AEDPA's procedure for second and successive federal habeas petitions. Before an applicant can proceed with such a petition, he must first file a motion for authorization in the court of appeals. 28 U. S. C. § 2244(b)(3)(A). If the applicant makes a prima facie showing that he satisfies the special requirements for second and successive petitions, the court of appeals authorizes proceedings in the district court. § 2244(b)(3)(C). But, if the applicant fails to make a prima facie showing, the court of appeals denies authorization, and the proceedings end. No matter how strong the applicant's ultimate claim, the court of appeals cannot grant habeas relief at that stage; only a district court may do so. For the same reason, it makes no sense to say that no "further evidentiary proceedings" are warranted because the OCCA "agree[d]" they are unnecessary. *Ante*, at 256. The OCCA's authority to *deny* relief without a hearing does not imply corresponding authority to summarily *grant* relief.

In short, multiple state-law issues foreclose this Court from holding that the OCCA "should have rendered" a "judgment" ordering a new trial. *Murdock*, 20 Wall., at 636. The Court therefore has no authority to order one itself.

3

The majority insists that "Glossip is entitled to a new trial" simply because "this Court has jurisdiction" and "[a] new trial is the remedy for a *Napue* violation." *Ante*, at 258. This response overlooks, however, that "States may apply their own neutral procedural rules to federal claims." *Howlett* v. *Rose*, 496 U. S. 356, 372 (1990). Here, Glossip seeks post-conviction relief under Oklahoma's PCPA. See § 1080(1); *supra*, at 277–279. Under that Act, a new trial is *not*

the remedy for a *Napue* violation unless Glossip also satisfies certain procedural requirements and unless his case first proceeds to a merits hearing before a state trial court. See § 1089(D)(4); *Slaughter*, 105 P. 3d, at 835.

For similar reasons, the majority's reliance on *Ake* v. *Oklahoma*, 470 U. S. 68 (1985), in which this Court reversed the OCCA and remanded for a new trial, *id.*, at 73–74, 87, is misplaced. See *ante*, at 258. The asserted state ground in that case was a "waiver rule" with an established exception for "federal constitutional errors." 470 U. S., at 74–75. In other words, the waiver rule turned on "whether federal constitutional error ha[d] been committed." *Id.*, at 75. Thus, it was perfectly clear that the rule there could not supply an independent ground for denying a federal constitutional claim. And, because the case arose on direct review, *id.*, at 73–74, the Court could also have confidence that no other state ground could support the decision below, and therefore that the petitioner was legally entitled to a new trial. Here, by contrast, the Court has found jurisdiction only by applying the *Long* presumption; the case arises from a subsequent post-conviction application in a complex state-law regime that imposes numerous procedural bars; there are several state grounds that could foreclose relief entirely; and the OCCA issued the decision below in a preliminary posture in which it was not authorized to order a new trial. Further, although the new-trial order in *Ake* was legally defensible, it was still a significant departure from ordinary practice, which is to remand for further proceedings even on direct review. See *supra*, at 294–295.

The majority further insists that no "precedent" requires a remand based on the *Long* presumption. *Ante*, at 257. It claims that at most this Court has recognized the power of state courts to " 'grant relief to criminal defendants' " under state law after erroneously granting relief under federal law. *Ibid.* That assertion is incorrect. *Evans* recognized state

courts' power to reinstate their judgments after reversal as part of a general discussion of the *Long* presumption. See 514 U. S., at 7–9. Its reasoning was not confined to the specific context of a state court granting relief to a criminal defendant. Similarly, treatise writers have recognized that state courts can reinstate their judgments *whenever* this Court "review[s] an ambiguous decision." Hart & Wechsler 672. And, more fundamentally, when this Court asserts jurisdiction based on the *Long* presumption, "we merely *assume* that there are no [adequate and independent state] grounds" justifying the decision below; we do not *conclusively decide* that none exists. 463 U. S., at 1042 (emphasis added). Without a definitive ruling that no independent state ground bars ordering a new trial, we cannot hold that ordering a new trial is the "judgment" that "the State court should have rendered." *Murdock*, 20 Wall., at 636. The majority cannot have it both ways. If it wants to rely on the *Long* presumption to find jurisdiction, it must accept the limitations that the presumption entails.

4

Finally, the majority asserts that Glossip is presently entitled to a new trial, because, under Oklahoma law, a concession that an error occurred at trial renders irrelevant all other legal obstacles to a new trial. *Ante*, at 256–257. As I have already explained, the precedents cited by the Court do not support that proposition; they establish only that courts have an independent duty to assess confessed errors for themselves, which is nearly the opposite of the majority's point. *Supra*, at 284–285. To make matters even more implausible, the Court apparently interprets this principle to mean that a confession of error transforms a nonmerits preliminary proceeding into a merits proceeding where the OCCA can directly order ultimate relief. And, more importantly, it is for the OCCA to decide whether state law ent-

tles Glossip to a new trial at this time, and it is absurd to think that the only conclusion the OCCA could reach is the majority's.

## B

Even if we could blind ourselves to the foregoing procedural issues, Glossip would still be entitled to no more than an evidentiary hearing on his *Napue* claim. The Court says that the facts "supported by the record establish a violation of *Napue*," as though it were a trial court making findings after an evidentiary hearing. *Ante*, at 258. That approach cannot possibly be right. The PCPA envisions that further proceedings are necessary if there are "controverted, previously unresolved factual issues." §1089(D)(5). On this record, I do not see how one could conclude that there is not even a genuine issue of fact as to whether a *Napue* claim has been established—especially considering that Glossip himself recognized below that, without further discovery, his claims rested on "speculation." Motion for Evidentiary Hearing, at 1–2.

Concluding that no new factual development is needed is particularly inappropriate given the alternative reading of the notes advanced by the Van Treese family in this Court. As discussed above, the family has argued that the supposed "smoking gun"—the notes from Box 8—in fact reflects Sneed's recollection of what defense counsel had asked him at two prior meetings. *Supra*, at 273–275, and n. 3. Smothermon and Ackley have likewise endorsed this interpretation, which casts serious doubt on Glossip's and the State's theory. *Ibid.* If Sneed simply reported that he was *asked* about Dr. Trombka without *admitting* Dr. Trombka prescribed him lithium, Smothermon and Ackley would have had no reason to know that Dr. Trombka prescribed him lithium. And, the indication in Ackley's notes that Sneed apparently mentioned his "'tooth'" being "'pulled'" suggests that Sneed stood by his earlier story that he was mistakenly prescribed lithium

when his tooth was pulled. 3 App. 940; see 2 *id.*, at 700 (Sneed's earlier statement).

Given the existence of a plausible alternative interpretation of the evidence, I would not order a new trial at this time even if we had discretion to do so. To the extent the Court insists it cannot endorse the family's theory because it relies on "extra-record materials not properly before the Court," *ante*, at 254, such as parts of Ackley's notes, that is because the parties collusively excluded this highly relevant evidence from the record in order to reach a predetermined outcome. The majority rewards this gamesmanship, and in so doing denies the victim's family the opportunity to present contrary evidence.

The "Government should turn square corners in dealing with the people." *St. Regis Paper Co.* v. *United States*, 368 U. S. 208, 229 (1961) (Black, J., dissenting). That command extends not only to criminal defendants, but also to their victims. "[C]onducting retrials years later inflicts substantial pain on crime victims," who must "relive their trauma and testify again," in this case 28 "years after the crim[e] occurred." *Edwards* v. *Vannoy*, 593 U. S. 255, 263–264 (2021). The Oklahoma Constitution recognizes this interest by giving crime victims like the Van Treese family the right—"which shall be protected by law in a manner no less vigorous than the rights afforded to the accused"—"to be heard in any proceeding involving release, plea, sentencing, disposition, parole and any proceeding during which a right of the victim is implicated." Art. II, § 34(A). Glossip, on the other hand, would suffer no prejudice from an evidentiary hearing in which the Van Treese family had the opportunity to present its case. If the evidence is as decisive as the majority believes, Glossip would still receive a new trial. There is no excuse for denying the Van Treese family its day in court.

After having bent the law at every turn to grant relief to Glossip, the Court suddenly retreats to faux formalism when

dealing with the victim's family. The Court concludes that it need not honor the family's right to be heard because the family did not request an evidentiary hearing earlier in the proceedings. *Ante*, at 256, n. 11. But, the family had no need to do so, since Glossip had conceded that "a hearing is necessary" for his claim to rise above the level of "speculation." Motion for Evidentiary Hearing, at 2. And, before this Court, the Van Treese family has vigorously asserted its interests. The family filed the only brief opposing certiorari in this case. See Brief for Victim Family Members et al. as *Amici Curiae* in Opposition. It filed a merits brief highlighting critical evidence that the parties sought to sweep under the rug. See *supra*, at 273–275, and n. 3. And, it filed a motion to participate in oral argument, which this Court denied. 603 U. S. 941 (2024). The majority's assertion that the family has sat on its rights is groundless. Nor is there any reason to believe that Oklahoma victims' right to be heard in "any proceeding," Art. II, §34(A), contains an implicit exception for "post-conviction hearings," *ante*, at 256, n. 11. Finally, even if the family had no formal right to be heard, any reasonable factfinder plainly could consider the account of the evidence that the family has brought to light, making the majority's procedural objections beside the point. Make no mistake: The majority is *choosing* to cast aside the family's interests. I would not.

\* \* \*

The Court's decision distorts our jurisdiction, imagines a constitutional violation where none occurred, and abandons basic principles governing the disposition of state-court appeals. I respectfully dissent.

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

p. 229, line 26: "157 P. 3d 143" is changed to "529 P. 3d 218"
p. 251, n. 9, line 4: "that" is inserted before "Sneed"
p. 258, line 4: "state" is inserted before "constitutional"